1

2

3

4

5

6

7

8

# UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

9  WILLIAM GARCIA,                              CASE NO. 1:03-CV-06658-REC-SMS-P

10              Plaintiff,                      FINDINGS AND RECOMMENDATIONS
                                                RECOMMENDING DEFENDANTS SNOW,
11       v.                                     NGUYEN, SMITH, AND RAMIREZ'S
                                                MOTION FOR SUMMARY ADJUDICATION
12  EDWARD ALMIEDA, et al.,                     BE GRANTED, DEFENDANT BRADISH'S
                                                MOTION FOR SUMMARY ADJUDICATION
13              Defendants.                     BE GRANTED, AND PLAINTIFF'S MOTION
                                                FOR PRELIMINARY INJUNCTIVE RELIEF
14                                              BE DENIED

15                                              (Docs. 65, 67, and 111)

16  _____/

17  I.    Defendants' Motions for Summary Judgment, and Plaintiff's Motion for Preliminary
          Injunctive Relief
18
          A.    Procedural History
19
                Plaintiff William Garcia ("Plaintiff") is a state prisoner proceeding pro se and in forma
20
    pauperis in this civil rights action pursuant to 42 U.S.C. § 1983.  This action is proceeding on
21
    Plaintiff's complaint, filed November 24, 2003, against Defendants Snow, Nguyen, Smith, Ramirez,[1]
22
    Bradish, and Katukota[2] for acting with deliberate indifference to Plaintiff's serious medical needs,
23
    in violation of the Eighth Amendment.  (Doc. 40.)  On August 2, 2005, Plaintiff filed a motion
24
    seeking a preliminary injunction mandating his transfer to a different institution that will treat him
25
    by relieving his pain.  (Docs. 65-66.)  Defendants Snow, Nguyen, Smith, and Ramirez filed an
26

27      _____

        [1] Identified as Ramerez in the complaint.
28
        [2] Identified as Vijaya in the complaint.  Defendant Vijaya Katukota has not been served.

                                              1

opposition on August 23, 2005, and Defendant Bradish filed an opposition on August 24, 2005. (Docs. 78-87.)

On August 12, 2005, Defendants Snow, Nguyen, Smith, and Ramirez filed a motion for summary judgment.  (Docs. 67-74.)  Plaintiff filed an opposition on September 14, 2005, and Defendants filed a reply on September 26, 2005.[3, 4]  (Docs. 90-94.)  On November 14, 2005, Defendant Bradish, who is represented by separate counsel, filed a motion for summary judgment. (Doc. 111.)  Plaintiff filed an opposition on November 30, 2005, and Defendant Bradish filed a reply on December 9, 2005.  (Docs. 112-119.)

   B.   <u>Defendants Snow, Nguyen, Smith, and Ramirez's Motion for Summary Adjudication</u>[5]

      1.   <u>Legal Standard</u>

Summary judgment is appropriate when it is demonstrated that there exists no genuine issue as to any material fact, and that the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).  Under summary judgment practice, the moving party

> [A]lways bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986).  "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" <u>Id</u>.  Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.

---

[3] Plaintiff was provided with notice of the requirements for opposing a motion for summary judgment by the Court in an order filed on July 29, 2004.  <u>Klingele v. Eikenberry</u>, 849 F.2d 409 (9th Cir. 1988).  (Doc. 20.)

[4] The Court declines to disregard Plaintiff's opposition on the grounds that it is untimely and not in compliance with Local Rule 56-260(b), as suggested by Defendants Snow, Nguyen, Smith, and Ramirez in their reply.  (Doc. 91.)

[5] The parties to both motions made various evidentiary objections.  All objections were reviewed by the Court and the evidence considered by the Court was done so in accordance with the Federal Rules of Evidence.

1   Id. at 322.  "[A] complete failure of proof concerning an essential element of the nonmoving party's

2   case necessarily renders all other facts immaterial."  Id.  In such a circumstance, summary judgment

3   should be granted, "so long as whatever is before the district court demonstrates that the standard

4   for entry of summary judgment, as set forth in Rule 56(c), is satisfied."  Id. at 323.

5       If the moving party meets its initial responsibility, the burden then shifts to the opposing

6   party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec.

7   Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  In attempting to establish the existence

8   of this factual dispute, the opposing party may not rely upon the denials of its pleadings, but is

9   required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery

10  material, in support of its contention that the dispute exists.  Rule 56(e); Matsushita, 475 U.S. at 586

11  n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that

12  might affect the outcome of the suit under the governing law, Anderson v. Liberty Lobby, Inc., 477

13  U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630

14  (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could

15  return a verdict for the nonmoving party, Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436

16  (9th Cir. 1987).

17      In the endeavor to establish the existence of a factual dispute, the opposing party need not

18  establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual

19  dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at

20  trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce

21  the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"

22  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963

23  amendments).

24      In resolving the summary judgment motion, the Court examines the pleadings, depositions,

25  answers to interrogatories, and admissions on file, together with the affidavits, if any.  Rule 56(c).

26  The evidence of the opposing party is to be believed, Anderson, 477 U.S. at 255, and all reasonable

27  inferences that may be drawn from the facts placed before the Court must be drawn in favor of the

28  opposing party, Matsushita, 475 U.S. at 587 (citing United States v. Diebold, Inc., 369 U.S. 654, 655

1  (1962) (per curiam).  Nevertheless, inferences are not drawn out of the air, and it is the opposing

2  party's obligation to produce a factual predicate from which the inference may be drawn.  Richards

3  v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th

4  Cir. 1987).

5         Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show

6  that there is some metaphysical doubt as to the material facts.  Where the record taken as a whole

7  could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for

8  trial.'"  Matsushita, 475 U.S. at 587 (citation omitted).

9                    2.    Summary of Relevant Allegations Set Forth in Plaintiff's Complaint

10        In his complaint, Plaintiff alleges that in 1997, he was diagnosed with "Hiatal Hurnia [sic]

11 Peptic Duodenitis" and was prescribed Prilosec for the condition on August 2, 2001.  Plaintiff alleges

12 that on September 1, 2001, he began experiencing pain in the lower left side of his stomach,

13 shortness of breath, and a tingling sensation running through his body.  Plaintiff alleges the pain did

14 not last long and he started feeling better after he lay down for approximately an hour.

15        Plaintiff alleges that in October of 2001, he went "man down," was in a lot of pain, and could

16 barely walk.  Plaintiff alleges he spoke to Medical Technical Assistant ("MTA") Duley, who took

17 his vital signs and then asked the doctor to look at Plaintiff.  Plaintiff alleges that Defendant Dr.

18 Snow came out of her office and Plaintiff told her that he had pain in the lower left side of his

19 stomach, was having a hard time breathing, and had a tingling sensation running through his body.

20 Plaintiff alleges that Defendant Snow told him that it was just old age and to get out of there.

21 Plaintiff alleges that MTA Duley had him sit down for about an hour, took his vital signs again, and

22 wrote him a three-day lay-in.  Plaintiff alleges that he lay down for the rest of the day in bad pain.

23        Plaintiff alleges that on May 18, 2002, he went "man down" and was taken to the CTC.

24 Plaintiff alleges he had pain in the lower left side of his stomach, shortness of breath, a tingling

25 sensation running through his body, and difficulty eating due to pain when eating.  Plaintiff alleges

26 the nurse told him he had a bulge on the lower left side of his stomach.  Plaintiff alleges that about

27 two hours later, Defendant Dr. Nguyen examined Plaintiff and told Plaintiff that he would get a CT

28 scan.  Plaintiff alleges he was given Tylenol and sent back to his cell.

1    Plaintiff alleges that on July 8, 2002, he was transferred to E yard.  Plaintiff alleges he was

2    in a lot of pain and having difficulty eating solid food.  On July 12, 2002, he went to the MTA clinic

3    and spoke with Defendant Smith, telling her that he had pain in the lower left side of his stomach,

4    shortness of breath, a tingling sensation running through his body, and difficulty eating solid food.

5    Plaintiff alleges that Defendant Smith told him there was nothing she could do for him and he would

6    have to put in a form to see the doctor.

7    Plaintiff alleges that he went "man down" on July 30, 2002, with really bad stomach pain.

8    Plaintiff alleges that he told Defendant Smith he was in a lot of stomach pain, was having a hard time

9    breathing, had a tingling sensation running through his body, and felt like he was having a heart

10   attack.  Plaintiff alleges Defendant Smith told him there was nothing she could do for him.

11   Plaintiff alleges that on July 31, 2002, he was seen by Dr. (Vijaya) Katukota.  Plaintiff alleges

12   that he told Dr. Katukota that he was in a lot of pain and could not get any help, and that everything

13   she had ordered for him since November of 2001 had not helped.  Plaintiff alleges that Dr. Katukota

14   told him there was nothing she could do and told Defendant Smith to get Plaintiff out of her office.

15   Plaintiff told Defendant Smith that he had been left in pain this whole time, he could not get anything

16   done, and no one would help him.  Plaintiff alleges that Defendant Smith told him she would take

17   care of it.

18   Plaintiff alleges that on September 9, 2002, he stopped taking Donnatal, which had been

19   prescribed for him, and went to the MTA clinic, where he told Defendant Smith that the medication

20   was making him sicker.  Plaintiff alleges that Defendant Smith told him to taking it until he saw a

21   doctor.

22   Plaintiff alleges that on November 9, 2002, he went to the MTA clinic and spoke with

23   Defendant Ramirez, who told him that there was nothing she could do for the pain and sent Plaintiff

24   away.  Plaintiff alleges that on November 14, 2002, he went to the MTA clinic and spoke with

25   Defendant Smith, telling her that he was still in pain and needed to see a doctor.  Plaintiff alleges that

26   Defendant Smith told him she would get him in to see a doctor the next day.

27   Plaintiff was seen by Defendant Dr. Nguyen on November 15, 2002.  Plaintiff alleges he told

28   Defendant Nguyen that he had bad pain in the lower left side of his stomach and it had spread all

around his lower stomach and back, and that he had shortness of breath and a tingling sensation running through his body.  Plaintiff alleges that Defendant Nguyen told him he had a lazy bowel and prescribed medication for Plaintiff to use the restroom.

Plaintiff alleges that on December 12, 2002, he went "man down" and went to the MTA clinic, where he spoke with Defendant Smith, telling her that he was sick, was in a lot of pain, and needed to see a doctor.  Plaintiff alleges Defendant Smith told him she would put him on the doctor's line for the next day.  Plaintiff alleges that he was seen by Dr. White on December 13, 2002.

Plaintiff alleges that on January 12, 2003, he was bit by a spider on his right leg.  On January 13, 2003, Plaintiff's leg was swollen and it hurt to walk.  On January 14, 2003, his leg was really swollen, he had a fever, and he felt really bad.  In the afternoon, Plaintiff got up and started down the stairs when he felt something running down his leg and saw blood and pus.  Plaintiff alleges that was he was given antibiotics and a lay-in that night.  Plaintiff alleges that on January 15, 2003, he was given more antibiotic shots and a lay-in until January 20, 2003.  Plaintiff alleges that on January 24, 2003, he was called to the CTC (Correctional Treatment Center) for his spider bite.  Plaintiff was seen by Defendant Dr. Snow, who told him it was not a spider bite, but a staph infection.  Defendant Snow gave Plaintiff hydrocortisone.

Plaintiff alleges that he was seen by Dr. Wu on January 28, 2003, for his spider bite.  Plaintiff alleges he told Dr. Wu that his leg was swollen and would not stop running, and he was on antibiotics.  Plaintiff alleges Dr. Wu wrote an order for Plaintiff to get his leg cleaned and wrapped every day until it was healed.  Plaintiff alleges that after he waited in line on January 30, 2003, to get his leg cleaned and wrapped, R.N. Reyes refused to provide him treatment.  Later that afternoon, Plaintiff was called to the MTA clinic and seen by Defendant Dr. Nguyen, who told Plaintiff that he did not need his leg cleaned and wrapped, and that Plaintiff could do it himself.  Plaintiff alleges that he did not have the proper tools to treat himself.

Plaintiff alleges that on March 14, 2003, he was finally seen by a stomach specialist, who set up a CT scan and "eudo scopy," and prescribed Vicodin for pain.  Plaintiff alleges that when he went to see about his medication a few days later, Defendant Ramirez told him that they do not give out

///

6

pain medication there.  Plaintiff alleges that he saw Defendant Nguyen on March 31, 2003, and Defendant told him that they do not give out pain medication anymore.

Plaintiff alleges that on July 16, 2003, he went to the MTA clinic and spoke to Defendant Ramirez about the results of the test he had done earlier in the month.  Plaintiff alleges that Defendant Ramirez told him that she would check and to come back the next day.  On July 17, 2003, Defendant Ramirez told Plaintiff that no record of his treatment could be found.

Plaintiff alleges that on August 13, 2003, he went "man down" and went to the MTA clinic, where he spoke with R.N. Avila and Defendant Ramirez.  Plaintiff alleges that he told them he was in a lot of pain in his lower stomach, it was hard to breathe, he had a tingling sensation running through his body, and he was throwing up.  Plaintiff alleges they told him to lie down on the ground outside until they called for him.  Plaintiff alleges that he lay on the handball court for forty-five minutes before getting up and asking Defendant Ramirez if she was going to get him a doctor. Plaintiff alleges Defendant Ramirez told him no and to get away from there.

Plaintiff alleges that he was seen by Defendant Nguyen on August 20, 2003, and told Defendant that he was in pain and needed help.  Plaintiff alleges that Defendant asked him how much he weighed and told him not to eat all of his meals.  Plaintiff alleges that when he told Defendant if he did not eat, he would starve, Defendant got mad at him and asked him to leave, but told him that a CT scan would be set up.

Plaintiff alleges that on November 3, 2003, he went "man down," was bleeding from his colon, and was in a lot of pain.  Plaintiff went to the MTA clinic and spoke with Defendant Ramirez, who put him in a holding cell until a doctor showed up.  Plaintiff alleges that he was in pain and still bleeding when an alarm went off.  Plaintiff alleges he was escorted outside and left there until they were finished with the problem.  Plaintiff alleges that he went back to the MTA window and told Defendant Ramirez that he was in a lot of pain, still bleeding, and in need of a doctor.  Plaintiff alleges Defendant Ramirez told him to get away from her window and that she did not care if Plaintiff was bleeding.  Plaintiff alleges that he repeated his problem and needs, and was told by Defendant Ramirez that if he did not get away from the window, she would have him removed by officers.  Plaintiff repeated his problem and needs for a third time, and was handcuffed and taken to

a cage in the program office by Officer Tweet at Defendant Ramirez's request. Plaintiff alleges he was left in the cage for thirty minutes, at which time a nurse told him he was going to the CTC to be checked out and evaluated. Plaintiff alleges that after approximately five hours, he was taken to Mercy Hospital and given a "colonostomy" and a "eudo-scopy." Plaintiff alleges he was in the hospital for three days.

Plaintiff alleges that he could not eat solid food for approximately one year and was living on soup. Plaintiff alleges that in July of 2002, he started eating solid foods again on doctor's orders, but was in a lot of pain from resuming eating solid food. Plaintiff alleges that, a year later, he is bleeding and in more pain, and his symptoms are getting worse. Plaintiff alleges that he is once again eating soups because it hurts too much to eat anything else. Plaintiff alleges that when he spoke to Defendant Snow, she told him that this is the way he will probably be, that there is probably no cure for him, and that he will be in pain for the rest of his life.

3.    <u>Undisputed Facts</u>[6]

1.    Plaintiff is an inmate currently, and at the relevant times, incarcerated at the California State Prison Substance Abuse Facility ("SATF") in Corcoran, California.

2.    Plaintiff did not graduate from high school and only completed the 10th grade. Plaintiff has taken some college courses. Plaintiff has no medical training and has not taken any courses in medicine or nursing.

3.    Plaintiff's complaints concerning his stomach symptoms, ailments, pain, care, and treatment relating to the Defendants commence on or about September 1, 2001, and continue until he filed the complaint on November 24, 2003.

4.    Defendant Dr. Kim Nguyen obtained his medical degree in 1978 from the University of Saigon, School of Medicine in Vietnam. He has been licensed to practice medicine in the

///

---

[6] Plaintiff's complaint and opposition are verified and shall be treated as affidavits for purposes of the summary judgment rule where they are based on facts within Plaintiff's personal knowledge of admissible evidence, and not merely on Plaintiff's belief. <u>Johnson v. Meltzer</u>, 134 F.3d 1393, 1399-1400 (9th Cir. 1998); <u>McElyea v. Babbitt</u>, 833 F.2d 196, 197-98 (9th Cir. 1987) (per curium); <u>Lew v. Kona Hospital</u>, 754 F.2d 1420, 1423 (9th Cir. 1985); Fed. R. Civ. P. 56(e).

State of California since 1995.  He received his board certification in Internal Medicine in 1996 from the American Board of Internal Medicine.

5.  Defendant Nguyen began his employment with the California Department of Corrections ("CDC") at SATF in 1997, and he is currently employed as a staff physician and surgeon at SATF.

6.  Defendant Nguyen's duties as a staff physician at SATF are to evaluate the health care concerns of inmates/patients, and provide or request appropriate medical treatment for them while applying CDC-approved criteria for the provision of health care.  Defendant Nguyen also directs other institutional medical staff, such as nurses and medical technical assistants, in the provision of medical care to inmates/patients.

7.  Defendant Dr. Sharon Snow graduated with a Bachelor of Arts degree from the State University of New York in 1967.  She obtained her medical degree from University of Calgary, Canada in 1975.  She has been licensed to practice medicine in the State of California since 1978.  She received board certification in emergency medicine in 1995.  She has 24 years of experience in emergency medicine and primary care.

8.  Defendant Snow began her employment with the CDC at SATF on January 2, 2001.  She is currently employed as a staff physician and surgeon at SATF.

9.  As a staff physician at SATF, Defendant Snow's duties are to evaluate the health care concerns of inmates/patients, and provide or request appropriate medical treatment for them while applying CDC-approved criteria for the provision of health care.  Defendant Snow also directs other institutional medical staff, such as nurses and medical technical assistants, in the provision of medical care to inmates/patients.

10.  Defendant Barbara Smith, R.N., obtained an A.S. degree in Nursing from Antelope Valley Junior College in 1982.  She obtained her R.N. license approximately 23 years ago.  Defendant Smith has previously worked as a nurse in intensive care units, medical and surgical units, obstetrics, home health care, and hospice.  She is licensed in the State of California.

///

11.  Defendant Smith has worked as a registered nurse (R.N.) for the CDC at SATF since 1999.

12.  As a registered nurse at SATF, Defendant Smith's duties are to evaluate the health care concerns of inmates/patients, and provide or request appropriate medical treatment for them while applying CDC-approved criteria for the provision of health care.  In the course of her job as a registered nurse, she takes the inmate/patient's complaint, takes vital signs, makes assessments (if the inmate/patient is not seeing a physician), schedules appointments with physicians, and gives treatments as ordered by physicians, as well as other duties.

13.  Defendant Lisa Ramirez graduated from Visalia Adult School in 1997.  She received her California LVN (Licensed Vocational Nurse) license in 1998.  Defendant Ramirez began employment with the CDC at SATF as a Medical Technical Assistant on July 21, 1998, and is currently employed in that capacity at SATF.

14.  As an MTA at SATF, Defendant Ramirez's duties are to evaluate the health care concerns of inmates/patients, and request appropriate medical treatment for them while applying CDC-approved criteria for the provision of health care.  In the course of her job as an MTA, she takes the inmate/patient's complaint, takes vital signs, and refers the inmate/patient to a registered nurse or physician as appropriate.   Defendant Ramirez also schedules appointments with physicians, administers medications as directed by a physician, and may give other treatments as ordered by physicians, as well as other duties.

15.  On November 27, 2001, Dr. Katukota, a CDC doctor, examined Plaintiff for a complaint of abdominal pain.  Dr. Katukota noted that Plaintiff had a history of acid reflux, had previously been diagnosed with a hiatal hernia, and was a smoker.  On physical exam, Dr. Katukota noted that Plaintiff's abdomen was soft and bowel signs were active, with no guarding or rebound.  Dr. Katukota's diagnosis was that the abdominal pain was due to either Plaintiff's hiatal hernia or gastritis.   Dr. Katukota counseled Plaintiff on stopping smoking and prescribed Pepcid, Gaviscon, and Donnatal medications for Plaintiff, who was to be seen for a follow-up appointment in forty-eight hours if the pain continued.

16.  On February 20, 2002, Dr. Katukota ordered an ultrasound of the gall bladder and pancreas to rule out stones, and lab tests including Amylase (an enzyme test to rule out pancreatitis),

CBC (complete blood count), Panel 23 (a comprehensive metabolic panel), thyroid and hepatitis profiles, and HIV testing. Dr. Katukota also ordered a CT scan of the abdomen, liver, and spleen to rule out cirrhosis, and prescribed Zantac and Gaviscon. Plaintiff was to be rechecked at a follow-up appointment in two weeks.

17. On May 13, 2002, Dr. Dunn ordered an X-ray of the abdomen as well as the medication Amoxil.

18. On May 18, 2002, Plaintiff was transported to the Emergency Room ("ER") at SATF's Correctional Treatment Center ("CTC") via an emergency vehicle for a complaint of abdominal pain. Defendant Nguyen prescribed Tylenol and sent Plaintiff back to the yard with an appointment to see his primary physician the following week.

19. On May 29, 2002, Plaintiff was evaluated by Dr. Medina for complaints of abdominal pain. Plaintiff reported an inability to swallow solid food, yet was gaining weight. He denied rectal bleeding and requested pain medications. Dr. Medina noted that Plaintiff's previous blood test was normal and his impression was non-specific abdominal pain. Dr. Medina ordered a CT scan of the abdomen, and recommended that Plaintiff receive a surgical consultation for an EGD (esophageal gastroduodenoscopy) exam or a colonoscopy. Dr. Medina also ordered various laboratory tests including CEA 99 and AFP (to rule out cancer of the gastrointestinal, or "GI" tract), Amylase, CBC, and liver function tests, as well as the medications Lactulose and Colace.

20. Plaintiff was seen on May 31, 2002, by Dr. Kumar, who ordered an ultrasound of the abdomen, liver, and gallbladder to rule out cholelithiasis (the presence or formation of gallstones).

21. On June 3, 2002, a physician's order signed by a Health Care Manager notes that Plaintiff was scheduled for an abdominal ultrasound on June 7, 2002. Plaintiff was to follow specific instructions regarding diet in preparation for this procedure. Plaintiff's medical file contains a signed acknowledgment dated June 6, 2002, regarding these instructions.

22. On June 4, 2002, Dr. Katukota noted in the medical record that an ultrasound of Plaintiff's gallbladder had been ordered and that he would follow up.

23.   On June 7, 2002, radiologist Dr. Centeno of Corcoran District Hospital reviewed Plaintiff's abdominal ultrasound.  The results showed a normal liver, gallbladder, and pancreas.

24.   On June 13, 2002, radiologist Dr. Thomas reviewed Plaintiff's abdominal X-ray.  The results showed a normal abdomen with an unremarkable gas pattern, and no organ enlargement, intra-abdominal calcifications, or foreign bodies.

25.   On July 5, 2002, Dr. Dunn ordered a stool O & P test (to rule out a parasitic intestinal infection) and a GI exam, upper and lower series, for Plaintiff.

26.   On July 14, 2002, Dr. Katukota renewed various medications for Plaintiff.  Dr. Katukota also noted that an upper GI series exam and an endoscopy had been ordered and that he would follow up.

27.   Dr. Deering dictated specific instructions on August 2, 2002, regarding diet for a test Plaintiff was to undergo.

28.   On August 2, 2002, Defendant Smith made a note of the physician's order directing Plaintiff not to eat or drink anything prior to a test to be given.

29.   On August 5, 2002, radiologist Dr. Thomas reviewed the results of Plaintiff's August 2, 2002, upper GI series exam, which revealed no ulcer or tumors of the esophagus or the stomach.  There was irritability of the duodenum, which suggested duodenitis.

30.   On August 13, 2002, Dr. Katukota prescribed Prilosec, Maalox, and Zantac for Plaintiff's stomach symptoms.

31.   On August 13, 2002, Defendant Smith made a note of the physician's order for the medications Prilosec, Maalox, and Zantac for Plaintiff, and faxed the order to the pharmacy.

32.   On August 23, 2002, Dr. Deering examined Plaintiff for a complaint of epigastric pain, and noted that the results of the upper GI exam were not available in the chart.  Dr. Deering also noted that Plaintiff had been scheduled for a lower GI exam and should be started on the medication Donnatal.  A possible referral to a gastroenterologist was contemplated after the reports of the upper and lower GI series exams were received.

33.   On September 17, 2002, Dr. Huang discontinued Donnatal as a medication for Plaintiff, reporting that the patient was not taking it.

34. On September 18, 2002, Defendant Smith made a note of a September 17, 2002, physician's order to discontinue the medication Donnatal, which Plaintiff was not taking. Defendant Smith faxed the order to the pharmacy.

35. On November 4, 2002, radiologist Dr. Thomas reviewed the results of Plaintiff's barium enema with air contrast. The results were negative.

36. On November 14, 2002, Defendant Nguyen saw Plaintiff at the E yard medical clinic for a complaint of constipation. Defendant Nguyen reviewed all previous gastrointestinal work-ups (abdominal X-ray, upper abdominal ultrasound, and barium enema). All tests showed no pathology except irritation of duodenitis. Defendant Nguyen discussed with Plaintiff the results of his barium enema and EGD, which were normal and negative. Defendant Nguyen's diagnosis was irritable bowel syndrome ("IBS") and hiatal hernia. Defendant Nguyen prescribed various medications for Plaintiff, including Protonix, Dulcolax, Metamucil, and Colace for 60 days.

37. On November 14, 2002, Defendant Smith made a note of Defendant Nguyen's order for the medications Protonix, Dulcolax, Metamucil, and Colace. She faxed the order to the pharmacy.

38. On December 16, 2002, Plaintiff was in the clinic. Defendant Smith took Plaintiff's vital signs in the MTA clinic on Plaintiff's yard and took him in to see Dr. White. Plaintiff complained of pain on his right side and stomach. Plaintiff informed Defendant Smith that his last bowel movement in the morning was normal. Dr. White then examined him.

39. Plaintiff was examined by Dr. White for complaints of abdominal pain, bloating, and constipation, with weight gain. Dr. White reviewed Plaintiff's medical history, which included diagnoses of GERD (gastroesophageal reflux) with hiatal hernia since age seventeen and a stab wound to the left flank, an upper GI series exam in October 2002 that revealed duodenitis, a barium enema in November 2002 that was negative, and a stool exam that was negative. Dr. White's clinical impression yielded a diagnosis of non-specific abdominal pain. She prescribed Pancrealipase, ordered an EKG exam and thyroid function tests, and recommended that Plaintiff be referred to a GI specialist.

40.    On January 6, 2003, Plaintiff was in the clinic.  Defendant Smith took his vital signs in the MTA clinic on his yard and took him in to see Dr. White.

41.    Plaintiff was again examined by Dr. White for complaints of abdominal pain, bloating, and constipation.  The clinical impression was abdominal pain and Dr. White noted that the results of the upper and lower GI studies that Plaintiff had received were all negative, with the exception of revealing gastritis.  Dr. White also noted that the abdominal ultrasound was negative and that Plaintiff had no response to a variety of medications.  She wanted to rule out IBD, malabsorption of food, and gluten sensitivity.  Dr. White ordered the medications Protonix, Neurontin (for abdominal pain), and Pancrealipase (for malabsorption), an X-ray of the lumbosacral spine for Plaintiff, and that Plaintiff should return to the clinic in thirty days.  Dr. White also made an urgent second request that Plaintiff receive a GI consult.

42.    Defendant Smith made a note of Dr. White's order for a lumbosacral spine x-ray and for the medications Protonix, Neurontin, and Pancrealipase, and faxed the order to the pharmacy.

43.    On January 14, 2003, Plaintiff was seen in the clinic by James Stice, R.N., for a complaint of a spider bite on his leg.  R.N. Stice observed some maceration of tissue, a red swollen area that was warm, and had some drainage.  Plaintiff complained of pain around the site.  Dr. White issued a telephone order for the antibiotics Rocephin and Keflex, as well as Tylenol. Dr. White also ordered that Plaintiff receive a one day lay-in and that Plaintiff should return to the clinic as needed.  On January 16, 2003, Dr. White extended the lay-in order by phone and Plaintiff was not to work until after being seen and reassessed the following Monday, January 20, 2003.

44.    On January 24, 2003, Plaintiff was sent to the CTC and saw surgeon Dr. Schuster regarding his spider bite and his complaints of abdominal pain.  Dr. Schuster noted a sore, red petechial area that was self-draining.  His plan indicated that no intervention was required at that time. Dr. Schuster also examined Plaintiff regarding his abdominal pain, reviewed the results of the previous diagnostic tests (including upper GI series exam which found duodenitis, and barium enema and abdominal ultrasound which were normal), and concluded that Plaintiff

///

14

1   had peptic ulcer disease ("PUD").  Dr. Schuster recommended that Plaintiff have an EGD
2   exam.

3   45.   On January 24, 2003, Plaintiff was called to the CTC for treatment.

4   46.   On January 27, 2003, Plaintiff was seen by Dr. Loaiza for treatment of his right leg.  Dr.
5   Loaiza prescribed local wound care of water, Iodine, a triple antibiotic ointment, a dressing,
6   and the oral antibiotic Tetracycline.

7   47.   Defendant Ramirez took Plaintiff in to see the doctor for the spider bite on his leg, and made
8   a note of Dr. Loaiza's order for local wound care of water, Iodine, and a triple antibiotic
9   ointment, as well as a dressing and the oral antibiotic Tetracycline.  Defendant Ramirez also
10  faxed the order to the pharmacy.

11  48.   On January 29, 2003, Plaintiff was again treated for the abscess on his right leg.  The
12  examining physician, Dr. Wu, had the clinical impression that the abscess was improving.
13  Dr. Wu additionally prescribed the antibiotics Dicloxacillin and Bactroban ointment and
14  further local wound care with Betadine.

15  49.   Defendant Ramirez took Plaintiff in to see Dr. Wu for treatment of the spider bite on his leg.
16  Defendant Ramirez also made a note of Dr. Wu's order for the antibiotics Dicloxacillin and
17  Bactroban ointment and further local wound care with Betadine.  Defendant Ramirez also
18  faxed the order to the pharmacy.

19  50.   On January 30, 2003, Plaintiff was again seen by Dr. Wu regarding the spider bite and for
20  abdominal pain.  Dr. Wu's clinical impression was an abscess with cellulitis and epigastric
21  pain. Dr. Wu wrote an order for the antibiotics Bactrim and Rifampin, and ordered a lipid
22  tests (a check of cholesterol levels for health maintenance).

23  51.   Defendant Ramirez took Plaintiff's vital signs prior to having him seen by Dr. Wu.
24  Defendant Ramirez faxed Dr. Wu's order to the pharmacy.

25  52.   On February 7, 2003, Plaintiff had a lumbosacral spine X-ray taken, which revealed
26  spondylosis (degenerative disease of the spine), but which was otherwise normal.

27  53.   On February 8, 2003, Defendant Snow treated Plaintiff in the ER for his continuing
28  symptoms and for complaints of a spider bite and a sore leg. After examining Plaintiff's leg,

15

Defendant Snow's clinical impression was that Plaintiff had an old, healing staph abscess, but no current cellulitis (subcutaneous inflammation of connective tissue), or infection. "Staph" is short for staphylococcus, a bacteria that infects the skin and mucus membranes. Plaintiff had already been seen by other doctors for this leg condition. Defendant Snow prescribed cortisone cream to be applied sparingly twice a day.

54. On February 19, 2003, Plaintiff was seen by Dr. Wu for a complaint of abdominal pain since September 2001, as well as weight gain and a tinea infection in the groin area (fungal infection of the skin). Dr. Wu's assessment was dyspepsia (upset stomach) and intestinal cramping. Dr. Wu noted that both upper and lower GI series tests, as well as an ultrasound, had been done. He prescribed Mycolog cream for the tinea, and Bentyl and Zantac for the abdominal pain. Dr. Wu also ordered lipid tests for Plaintiff.

55. Defendant Ramirez made a note of Dr. Wu's order for Mycolog cream (for skin infections), and Bentyl and Zantac (for IBS and gas pain). Dr. Wu also ordered lipid tests for Plaintiff. Defendant Ramirez faxed the order to the pharmacy

56. On March 14, 2003, Plaintiff was seen by an outside specialist, Dr. Krishan at San Joaquin Community Hospital, for evaluation of abdominal pain. Plaintiff also complained of back pain and constipation, but denied any bleeding from the rectum, nausea, or vomiting. After examining Plaintiff, Dr. Krishan's clinical impression was that the etiology of Plaintiff's abdominal pain was unclear and that it was necessary to rule out PUD and inflammatory bowel disease ("IBD"). Dr. Krishan recommended that Plaintiff have a colonoscopy and an EGD exam if the colonoscopy was negative. IBS was also suspected. Dr. Krishan recommended that Plaintiff be started on Metamucil and Vicodin.

57. On March 15, 2003, Dr. Gonzales ordered Plaintiff be given Metamucil.

58. When an outside physician prescribes a medication, the order is first evaluated by an institutional physician to see if the medication is indicated and appropriate for the inmate. The order then has to be rewritten by the institutional physician. Once the medication order is rewritten, the prescription is filled by the pharmacy and sent out to the yard to be delivered to the inmate.

59. On March 18, 2003, Dr. Wu reviewed Plaintiff's previous work-ups and the consultant's report from GI specialist Dr. Krishan.  Dr. Wu noted that the results of Plaintiff's barium enema in November 2002 were normal, that his upper GI series exam in August 2002 indicated Plaintiff had duodenitis, and that the August 2002 test for H. pylori bacteria (to investigate his dyspepsia and PUD symptoms) was negative.  Dr. Wu's note contains no order for any pain medication for Plaintiff.

60. On March 31, 2003, Defendant Nguyen examined Plaintiff in the ER for complaints of chest pain and pressure on the lower chest wall, abdominal pain, and shortness of breath.  The physical exam was unremarkable and an EKG was normal.  Plaintiff had low coronary artery disease risk.  Plaintiff also had a history of hiatal hernia, which had been seen on a previous EGD (esophageal gastroduodenoscopy) exam.  In addition, Plaintiff had a normal barium enema and a normal ultrasound of the abdomen.  Defendant Nguyen's diagnosis was likely hiatal hernia.  Defendant Nguyen ordered Maalox and Protonix medications that were given to Plaintiff in the ER, and the doctor ordered more upon Plaintiff's return to the yard.

61. Defendant Nguyen saw Plaintiff on March 31, 2003, in the ER as the ER physician.  Decisions to pursue tests such as an EGD, colonoscopy, or CT scan are made by the inmate's primary physician, which was Dr. Wu at that time.

62. When outside specialists propose diagnostic tests, treatments, procedures, or medications for inmate/patients, these recommendations are evaluated by an institutional physician and then ordered, if felt to be medically indicated, necessary, and within CDC-approved criteria for patient care.  Based on Defendant Nguyen's review of Plaintiff's medical file, the decisions regarding the use of Vicodin or other medications, and whether to pursue medical tests (including an EGD, colonoscopy or CT scan), were made by Dr. Wu, who was Plaintiff's primary care physician in March 2003.

63. During the relevant time period (September 2001 through December 2003), Plaintiff was seen by many medical doctors at SATF.  Physicians at SATF do order pain medications for inmates, including Vicodin, when and if it is clearly medically indicated.  Vicodin, as a narcotic, is not indicated for treatment of hiatal hernia and IBS.  These conditions tend to be

17

chronic and the use of Vicodin would lead to abuse and addiction. Vicodin was not medically appropriate or indicated on any of the occasions when Defendant Nguyen examined Plaintiff. Additionally, when Plaintiff saw a GI specialist on November 5, 2003, the specialist, Dr. Bhaika, did not order Vicodin or any narcotic medication to treat Plaintiff's symptoms.

64. On May 9, 2003, Plaintiff was seen by Dr. Wu for a complaint of abdominal pain, with pain before meals and more pain after meals. Dr. Wu reviewed Plaintiff's previous work-ups, diagnosed IBS and indigestion, and ordered the medications Protonix and Bentyl. Dr. Wu also specified that Plaintiff was to be followed up in four weeks.

65. On May 22, 2003, Plaintiff was sent from SATF to Corcoran District Hospital, where surgeon Dr. Schuster was to examine him and perform an EGD exam. Dr. Schuster noted Plaintiff's chief complaint as epigastric abdominal pain since September 2001. After taking the patient's history and doing a physical exam, Dr. Schuster's impression was that Plaintiff's abdominal pain was probably peptic in origin. Dr. Schuster performed the EGD exam and found that Plaintiff had minimal gastritis (common, nonspecific irritation of the mucosa, or inner layer) of the stomach, but found no significant abnormalities in the esophagus, duodenum, or cords of the trachea. Dr. Schuster noted that Plaintiff could resume a normal diet, walk as tolerated, and be returned to SATF. No other recommendations for further follow up were noted by Dr. Schuster.

66. On August 14, 2003, Plaintiff complained to his counselor that he did not receive any of his medication. Defendant Ramirez was able to get the original orders renewed and had Plaintiff scheduled for a follow-up appointment with his medical doctor on the yard. Plaintiff was seen on August 20, 2003, for this follow-up appointment.

67. On August 20, 2003, Plaintiff went to the E yard clinic to obtain the results of his EGD exam. The EGD result was not available in the file. Defendant Nguyen noted that he would review the endoscopic (EGD) results. If the endoscopic result was non-diagnostic, the progress note further mentions that Defendant Nguyen would consider a CT scan of the abdomen for Plaintiff. Defendant Nguyen also discussed weight reduction with Plaintiff,

18

which may help reduce hiatal hernia symptoms. Defendant Nguyen also talked to Plaintiff about his positive Hepatitis C status, and informed Plaintiff that because his viral count was below detectable levels, treatment for Hepatitis C was not indicated. Plaintiff was currently taking the medications Protonix and Bentyl.

68.  On August 20, 2003, Defendant Nguyen informed Plaintiff that he would consider having a CT scan done if the endoscopic exam turned out to be non-diagnostic.

69.  Plaintiff was in the ER on November 4, 2003, and treated by Defendant Snow. Plaintiff was seen and complained of bleeding from his rectum in teaspoon amounts. Defendant Snow took a history, did a physical exam of Plaintiff, and reviewed the results of both his prior upper and lower GI series exams. Defendant Snow's diagnosis was lower gastrointestinal bleeding. Defendant Snow then sent Plaintiff by ambulance to Mercy Hospital in Bakersfield for further evaluation of a lower gastrointestinal bleed.

70.  On November 5, 2003, Plaintiff was evaluated by specialists Drs. Yokoyama and Bhaika of the GI clinic at Mercy Hospital. Their impression was that Plaintiff had abdominal pain and a lower GI bleed. Dr. Bhaika performed both esophageal gastroduodenoscopy ("EGD") and colonoscopy exams on Plaintiff. Dr. Bhaika found that Plaintiff had no significant PUD, a spastic colon, polyps, mild non-specific proctitis, and internal hemorrhoids. His recommendations were that Plaintiff be given a high fiber diet and should be prescribed Pepcid, Donnatal, Protonix, Anusol suppository, and Metamucil. Dr. Bhaika noted that no further follow-up was needed, and his findings essentially concurred with the findings of the SATF physicians who had evaluated and treated Plaintiff.

71.  On November 6, 2003, institutional physician Dr. Deering reviewed GI specialist Dr. Bhaika's recommendations and ordered Protonix, Anusol, and Metamucil for Plaintiff.

72.  On November 21, 2003, Defendant Nguyen saw Plaintiff in the E yard medical clinic for a complaint of pain on defecation. Defendant Nguyen examined Plaintiff and reviewed Dr. Bhaika's November 5, 2003, report. Defendant Nguyen did not have a separate diagnosis for Plaintiff and concurred with specialist Dr. Bhaika's finding that Plaintiff had IBS. Also,

///

19

1    when Dr. Bhaika examined Plaintiff on November 5, 2003, he made no recommendation for

2    a CT scan.  Defendant Nguyen reordered a hemorrhoid suppository.

3    73.    IBS is a chronic condition affecting approximately 20% of the population and is caused by

4    abnormal colon motility (or movement).  It is a chronic disorder which is characterized by

5    periods of exacerbation and quiescence, and symptoms vary from patient to patient.  IBS is

6    not life-threatening or of an emergency nature, and it does not necessitate surgical treatment.

7    It is best treated conservatively, with a high fiber diet, adequate fluid intake, and regular

8    exercise.  When patients are more symptomatic, IBS can be additionally treated with fiber

9    supplementation (such as Metamucil), and medications to reduce excessive colon

10    contractions, such as Bentyl, all of which were prescribed for Plaintiff during the relevant

11    time period.

12         4.    Discussion

13    Plaintiff alleges that Defendants Snow, Nguyen, Smith, and Ramirez ("Defendants") violated

14    his rights under the Eighth Amendment by failing to provide him with adequate and/or competent

15    medical care, namely relief from his stomach pain.  To constitute cruel and unusual punishment in

16    violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary

17    infliction of pain." Rhodes v. Chapman, 452 U.S. 337, 347 (1981).  A prisoner's claim of inadequate

18    medical care does not rise to the level of an Eighth Amendment violation unless (1) "the prison

19    official deprived the prisoner of the 'minimal civilized measure of life's necessities,'" and (2) "the

20    prison official 'acted with deliberate indifference in doing so.'" Toguchi v. Chung, 391 F.3d 1051,

21    1057 (9th Cir. 2004) (quoting Hallett v. Morgan, 296 F.3d 732, 744 (9th Cir. 2002) (citation

22    omitted)).  A prison official does not act in a deliberately indifferent manner unless the official

23    "knows of and disregards an excessive risk to inmate health or safety." Farmer v. Brennan, 511 U.S.

24    825, 834 (1994).  Deliberate indifference may be manifested "when prison officials deny, delay or

25    intentionally interfere with medical treatment," or in the manner "in which prison physicians provide

26    medical care." McGuckin v. Smith, 974 F.2d 1050, 1059 (9th Cir. 1992), overruled on other

27    grounds, WMX Techs., Inc. v. Miller, 104 F.3d 1133, 1136 (9th Cir. 1997) (en banc).  Where a

28    prisoner is alleging a delay in receiving medical treatment, the delay must have led to further harm

20

1  in order for the prisoner to make a claim of deliberate indifference to serious medical needs.

2  McGuckin, 974 F.2d at 1060 (citing Shapely v. Nevada Bd. of State Prison Comm'rs, 766 F.2d 404,

3  407 (9th Cir. 1985)).

4      Defendants contend that in October of 2001, Defendant Snow evaluated Plaintiff for a "man

5  down" (emergency) situation, and found all vital signs were normal.  (Doc. 72, Snow Dec., ¶7.)

6  Defendant Snow's diagnosis at the time was abdominal pain not otherwise specified, but that there

7  was no emergency at the time. (Id.)  Defendant Snow denies that she would have told an inmate that

8  it was just old age and to get out of there.  (Id.)

9      Defendants contend that if an inmate/patient states "man down," all regular operations at the

10  medical clinic cease.  (Id., ¶8.)  The clinic is shut down and locked until the inmate/patient claiming

11  "man down" can be evaluated.  (Id.)  When an inmate/patient is "man down," it means that he is not

12  ambulatory and he must either be brought to a medical clinic or the ER, or medical staff attend to

13  him at the "man down" location before he is brought to the appropriate medical facility, if necessary.

14  (Id.)  If an inmate/patient presents to the medical clinic with symptoms such as shortness of breath

15  or states he believes he is having a heart attack, the proper procedure would be for the on-site

16  registered nurse or MTA to do an immediate visual assessment, take vital signs, and consult with

17  physician staff in person or by phone.  (Id.)  If necessary, treatment is then given at the site by the

18  physician or by the nursing staff as directed by the physician, including sending the inmate/patient

19  to the ER for further evaluation and treatment.  (Id.)

20      On November 27, 2001, Dr. Katukota examined Plaintiff for a complaint of abdominal pain.

21  (Undisputed Fact 15.)  Dr. Katukota noted that Plaintiff had a history of acid reflux, had previously

22  been diagnosed with a hiatal hernia, and was a smoker. (Id.)  On physical exam, Dr. Katukota noted

23  that Plaintiff's abdomen was soft and bowel signs were active, with no guarding or rebound.  (Id.)

24  Dr. Katukota's diagnosis was that the abdominal pain was due to either Plaintiff's hiatal hernia or

25  gastritis.  (Id.)  Dr. Katukota counseled Plaintiff on stopping smoking and prescribed Pepcid,

26  Gaviscon, and Donnatal medications for Plaintiff, who was to be seen for a follow-up appointment

27  in forty-eight hours if the pain continued.  (Id.)

28  ///

21

On February 20, 2002, Dr. Katukota ordered an ultrasound of the gall bladder and pancreas to rule out stones, and lab tests including Amylase (an enzyme test to rule out pancreatitis), CBC (complete blood count), Panel 23 (a comprehensive metabolic panel), thyroid and hepatitis profiles, and HIV testing. (U.F. 16.) Dr. Katukota also ordered a CT scan of the abdomen, liver, and spleen to rule out cirrhosis, and prescribed Zantac and Gaviscon. (Id.) Plaintiff was to be rechecked at a follow-up appointment in two weeks. (Id.)

On May 13, 2002, Dr. Dunn ordered an X-ray of the abdomenas well as the medication Amoxil. (U.F. 17.)

On May 18, 2002, Plaintiff was transported to the ER at SATF's CTC via an emergency vehicle for a complaint of abdominal pain. (U.F. 18.) Defendants contend that during Defendant Nguyen's physical examination of Plaintiff, Plaintiff related a history of low grade left flank pain for nine months, and denied nausea, vomiting, or diarrhea, and that upon examination there was mild left flank tenderness. (Doc. 70, Nguyen Dec., ¶10.) Defendant Nguyen prescribed Tylenol and sent Plaintiff back to the yard with an appointment to see his primary physician the following week. (U.F. 18.) Defendant Nguyen denies he stated to Plaintiff that he would get Plaintiff to a CT scan, as the inmate's primary physician is the one to follow up regarding a previously ordered CT scan. (Nguyen Dec., ¶10.)

On May 29, 2002, Plaintiff was evaluated by Dr. Medina for complaints of abdominal pain. (U.F. 19.) Plaintiff reported an inability to swallow solid food, yet was gaining weight. (Id.) Plaintiff denied rectal bleeding and requested pain medications. (Id.) Dr. Medina noted that Plaintiff's previous blood test was normal and his impression was non-specific abdominal pain. (Id.) Dr. Medina ordered a CT scan of the abdomen, and recommended that Plaintiff receive a surgical consultation for an EGD (esophageal gastroduodenoscopy) exam or a colonoscopy. (Id.) Dr. Medina also ordered various laboratory tests including CEA 99 and AFP (to rule out cancer of the GI tract), Amylase, CBC, and liver function tests, as well as the medications Lactulose and Colace. (Id.)

Plaintiff was seen on May 31, 2002, by Dr. Kumar, who ordered an ultrasound of the abdomen, liver, and gallbladder to rule out cholelithiasis (the presence or formation of gallstones).

(U.F. 20.) On June 3, 2002, a physician's order signed by a Health Care Manager notes that Plaintiff was scheduled for an abdominal ultrasound on June 7, 2002. (U.F. 21.)  Plaintiff was to follow specific instructions regarding diet in preparation for this procedure. (Id.)  Plaintiff's medical file contains a signed acknowledgment dated June 6, 2002, regarding these instructions. (Id.)  On June 4, 2002, Dr. Katukota noted in the medical record that an ultrasound of Plaintiff's gallbladder had been ordered and that he would follow up. (U.F. 22.)  On June 7, 2002, radiologist Dr. Centeno of Corcoran District Hospital reviewed Plaintiff's abdominal ultrasound.  (U.F. 23.)  The results showed a normal liver, gallbladder, and pancreas. (Id.)  On June 13, 2002, radiologist Dr. Thomas reviewed Plaintiff's abdominal X-ray. (U.F. 24.)  The results showed a normal abdomen with an unremarkable gas pattern, and no organ enlargement, intra-abdominal calcifications, or foreign bodies. (Id.)  On July 5, 2002, Dr. Dunn ordered a stool O & P test (to rule out a parasitic intestinal infection) and a GI exam, upper and lower series, for Plaintiff.  (U.F. 25.)

With respect to Plaintiff's allegations that on July 12, 2002, he went to the medical clinic for stomach pain, shortness of breath, and a tingling sensation, and was told by Defendant Smith that there was nothing she could do for him and she would have to put in a medical form for him to see the doctor, Defendant contends that she has no specific recollection of having this conversation with Plaintiff, and there is no mention of this date in Plaintiff's medical file.  (Doc. 71, Smith Dec., ¶9.) Defendant contends that when an inmate/patient presents with symptoms as stated above, the procedure for an inmate to be properly evaluated is for the inmate to submit a medical form so that an appointment with a physician can be scheduled, and that Plaintiff was in fact seen two days later. (Id.)

On July 14, 2002, Dr. Katukota renewed various medications for Plaintiff. (U.F. 26.) Dr. Katukota also noted that an upper GI series exam and an endoscopy had been ordered and that he would follow up.  (Id.)

Defendant Smith contends that with respect to Plaintiff's allegations that on July 30, 2002, he told her he was having stomach pain, a hard time breathing, a tingling sensation running through his body, and felt he was having a heart attack, and she told him that there was nothing she could do for him, she has no specific recollection of having this conversation with Plaintiff or making such

a statement to him, and there is no mention of this interaction in Plaintiff's medical file.  (Smith Dec., ¶10.)  Defendant contends that if an inmate/patient presented with symptoms of a serious nature, the pattern and practice of the staff would be to evaluate the patient and make note of it in the medical file, and it would not be her practice to turn an inmate/patient away who demonstrates or complains of symptoms which might be indicative of a serious medical condition.  (Id.)

With respect to Plaintiff's allegation that on July 31, 2002, he told her that he had been left in pain and no one would help him, and she said she would take care of it, Defendant Smith has no specific recollection of this conversation, and there is no mention of this date in his medical file. (Smith Dec., ¶13.)  Defendant Smith contends that when an inmate/patient presents with symptoms as stated above, the procedure to be properly evaluated would be to submit a medical form so that an appointment with a physician can be scheduled.  (Id.)

Dr. Deering dictated specific instructions on August 2, 2002, regarding diet for a test Plaintiff was to undergo, and on August 2, 2002, Defendant Smith made a note of the physician's order directing Plaintiff not to eat or drink anything prior to a test to be given.  (U.F. 27-28.)  Defendant Smith contends she does not recall any contact with Plaintiff that day, although Plaintiff alleges that he was called to the CTC for his upper gastrointestinal series exam on August 2, 2002.  (Smith Dec., ¶14.)  On August 5, 2002, radiologist Dr. Thomas reviewed the results of Plaintiff's August 2, 2002, upper GI series exam, which revealed no ulcer or tumors of the esophagus or the stomach.  (U.F. 29.) There was irritability of the duodenum, which suggested duodenitis.  (Id.)  On August 13, 2002, Dr. Katukota prescribed Prilosec, Maalox, and Zantac for Plaintiff's stomach symptoms.  (U.F. 30.)  On August 13, 2002, Defendant Smith made a note of the physician's order for the medications Prilosec, Maalox, and Zantac for Plaintiff, and faxed the order to the pharmacy.  (U.F. 31.)  Defendant Smith contends she does not recall any contact with Plaintiff that day and does not remember the nature of Plaintiff's condition or his complaint that day.  (Smith Dec., ¶15.)

On August 23, 2002, Dr. Deering examined Plaintiff for a complaint of epigastric pain, and noted that the results of the upper GI exam were not available in the chart.  (U.F. 32.)  Dr. Deering also noted that Plaintiff had been scheduled for a lower GI exam and should be started on the

///

24

medication Donnatal.  (Id.)  A possible referral to a gastroenterologist was contemplated after the reports of the upper and lower GI series exams were received.  (Id.)

Defendant Smith contends that she does not recall speaking to Plaintiff on September 9, 2002, when Plaintiff alleges that he stopped taking the medication Donnatal, that he told Defendant Smith it was making him sick, and that she told him to stop taking the medications until he sees a doctor, and Defendant contends that there is no mention of this interaction in Plaintiff's medical file. (Smith Dec., ¶16.) Defendant contends that if an inmate/patient tells her that a medication is making him sick, it is her typical pattern and practice to inform him what the medication is for, ask him why he thinks it is making him sick, and tell him he can stop taking the medication if he believes it is making him sick.  (Id.)  She would then inform the physician or make a note that the inmate has stopped taking the medication.  (Id.)

On September 17, 2002, Dr. Huang discontinued Donnatal as a medication for Plaintiff and reported that the patient was not taking it.  (U.F. 33.)  On September 18, 2002, Defendant Smith made a note of a September 17, 2002, physician's order to discontinue the medication Donnatal, which Plaintiff was not taking.  (U.F. 34.)  Defendant Smith faxed the order to the pharmacy.  (Id.) Defendant contends that she does not recall any contact with Plaintiff that day and would not know the nature of his condition or his complaint that day.  (Smith Dec., ¶17.)

On November 4, 2002, radiologist Dr. Thomas reviewed the results of Plaintiff's barium enema with air contrast, which were negative.  (U.F. 35.)

Defendant Ramirez contends that she rendered care to Plaintiff, or on his behalf, on only a few occasions between September 2001 through December 2003.  (Doc. 73, Ramirez Dec., ¶6.) Defendant contends that the records indicate Plaintiff was seen by other medical staff at SATF and by outside physicians on several occasions for treatment of his complaints during that time period, and that many of the dates mentioned in Plaintiff's complaint where he alleges he was seen by her are not borne out by the medical record.  (Id.)

Defendant Ramirez contends that she has no specific recollection of having the conversation with Plaintiff on November 9, 2002, in which she allegedly said to him that there was nothing she could do for the pain he was in and sent him away, and that there is no note referring to this date in

Plaintiff's medical file. (<u>Id</u>., ¶7.) Defendant contends that it is not her pattern or practice to tell inmate/patients there is nothing she can do for them, that if an inmate/patient presented with symptoms of a serious nature, the pattern and practice would be to evaluate the patient and make note of it in the medical file, and that it would not be her practice to turn an inmate/patient away who demonstrates or complains of symptoms which might be indicative of a serious medical condition. (<u>Id</u>.) Further, Defendant contends that she was not working during the time of November 8-10, 2002, when the alleged conversation took place. (<u>Id</u>.)

Defendant Smith contends that she has no specific recollection of an alleged conversation on November 14, 2002, in which Plaintiff told her that he was in pain and needed a doctor, and she stated she would get him in to see a doctor the next day, and she contends that the conversation is not documented in the medical file. (Smith Dec., ¶18.) Plaintiff was seen by Defendant Nguyen on that date, however. (U.F. 36.)

On November 14, 2002, Defendant Nguyen saw Plaintiff at the E yard medical clinic for a complaint of constipation. (U.F. 36.) Defendant Nguyen reviewed all previous gastrointestinal work-ups (abdominal X-ray, upper abdominal ultrasound, and barium enema). (<u>Id</u>.) All tests showed no pathology except irritation of duodenitis. (<u>Id</u>.) Defendant Nguyen discussed with Plaintiff the results of his barium enema and EGD, which were normal and negative. (<u>Id</u>.) Defendant Nguyen's diagnosis was IBS (irritable bowel syndrome) and hiatal hernia. (<u>Id</u>.) Defendant Nguyen prescribed various medications for Plaintiff, including Protonix, Dulcolax, Metamucil, and Colace for 60 days. (<u>Id</u>.) On that date, Defendant Smith made a note of Defendant Nguyen's order for the medications Protonix, Dulcolax, Metamucil, and Colace, and she faxed the order to the pharmacy. (U.F. 37.)

Defendant Smith contends that she has no recollection of having a conversation with Plaintiff on December 12, 2002, in which Plaintiff allegedly told her he was sick, in a lot of pain, and in need of a doctor, and she told him she would put him on the doctor's line for the following day. (Smith Dec., ¶20.) Further, Defendant contends that the conversation is not documented in the medical file. (<u>Id</u>.)

///

26

On December 16, 2002, Plaintiff was in the clinic, where Defendant Smith took his vital signs and then took him in to see Dr. White. (U.F. 38.) Plaintiff complained of pain on his right side and stomach, and informed Defendant Smith that his last bowel movement in the morning was normal. (Id.) Dr. White then examined Plaintiff for his complaints of abdominal pain, bloating, and constipation, with weight gain. (U.F. 39.) Dr. White reviewed Plaintiff's medical history, which included diagnoses of GERD (gastroesophageal reflux) with hiatal hernia since age seventeen and a stab wound to the left flank, an upper GI series exam in October 2002 that revealed duodenitis, a barium enema in November 2002 that was negative, and a stool exam that was negative. (Id.) Dr. White's clinical impression yielded a diagnosis of non-specific abdominal pain. (Id.) Dr. White prescribed Pancrealipase, ordered an EKG exam and thyroid function tests, and recommended that Plaintiff be referred to a GI specialist. (Id.)

On January 6, 2003, Plaintiff was in the clinic. (U.F. 40.) Defendant Smith took his vital signs in the MTA Clinic on his yard and took him in to see Dr. White, who again examined him for complaints of abdominal pain, bloating, and constipation. (U.F. 40, 41.) The clinical impression was abdominal pain and Dr. White noted that the results of the upper and lower GI studies that Plaintiff had received were all negative, with the exception of revealing gastritis. (U.F. 41.) Dr. White also noted that the abdominal ultrasound was negative and that Plaintiff had no response to a variety of medications. (Id.) Dr. White wanted to rule out IBD (inflammatory bowel disease), malabsorption of food, and gluten sensitivity. (Id.) Dr. White ordered the medications Protonix, Neurontin (for abdominal pain), and Pancrealipase (for malabsorption), an X-ray of the lumbosacral spine for Plaintiff, and that Plaintiff should return to the clinic in thirty days. (Id.) Dr. White also made an urgent second request that Plaintiff receive a GI consult. (Id.) Defendant Smith made a note of Dr. White's order for a lumbosacral spine x-ray and for the medications Protonix, Neurontin, and Pancrealipase, and faxed the order to the pharmacy. (U.F. 42.)

On January 14, 2003, Plaintiff was seen in the clinic by James Stice, R.N., for a complaint of a spider bite on his leg, and pain around the site. (U.F. 43.) R.N. Stice observed some maceration of tissue, a red swollen area that was warm, and had some drainage. (Id.) Dr. White issued a telephone order for the antibiotics Rocephin and Keflex, as well as Tylenol. (Id.) Dr. White also

1  ordered that Plaintiff receive a one day lay-in and that Plaintiff should return to the clinic as needed.

2  (Id.)  On January 16, 2003, Dr. White extended the lay-in order by phone and Plaintiff was not to

3  work until after being seen and reassessed the following Monday, January 20, 2003.  (Id.)

4        On January 24, 2003, Plaintiff was sent to the CTC and saw surgeon Dr. Schuster regarding

5  his spider bite and his complaints of abdominal pain. (U.F. 44.)  Dr. Schuster noted a sore, red

6  petechial area that was self-draining.  (Id.)  His plan indicated that no intervention was required at

7  that time.  (Id.)  Dr. Schuster also examined Plaintiff regarding his abdominal pain, reviewed the

8  results of the previous diagnostic tests (including upper GI series exam which found duodenitis, and

9  barium enema and abdominal ultrasound which were normal), and concluded that Plaintiff had

10  peptic ulcer disease ("PUD").  (Id.)  Dr. Schuster recommended that Plaintiff have an EGD exam.

11  (Id.)

12        Defendants contend that on January 24, 2003, Plaintiff was called to the CTC for treatment

13  of a spider bite and stomach pains. (U.F. 45; Snow Dec., ¶9.)  Defendants contend that although

14  Plaintiff claims he was examined by Defendant Snow, a review of the medical record reveals that

15  Plaintiff was in fact treated by surgeon Dr. Schuster on January 24, 2003, not Defendant Snow.

16  (Snow Dec., ¶9.)

17        On January 27, 2003, Plaintiff was seen by Dr. Loaiza for treatment of his right leg.  (U.F.

18  46.) Dr. Loaiza prescribed local wound care of water, Iodine, a triple antibiotic ointment, a dressing,

19  and the oral antibiotic Tetracycline.  (Id.)  Defendant Ramirez took Plaintiff in to see the doctor for

20  the spider bite on his leg, and made a note of Dr. Loaiza's order for local wound care of water,

21  Iodine, and a triple antibiotic ointment, as well as a dressing and the oral antibiotic Tetracycline.

22  (U.F. 47.)  Defendant Ramirez also faxed the order to the pharmacy.  (Id.)

23        On January 29, 2003, Plaintiff was again treated for the abscess on his right leg. (U.F. 48.)

24  The examining physician, Dr. Wu, had the clinical impression that the abscess was improving.  (Id.)

25  Dr. Wu additionally prescribed the antibiotics Dicloxacillin and Bactroban ointment and further local

26  wound care with Betadine.  (Id.)  Defendant Ramirez took Plaintiff in to see Dr. Wu for treatment

27  of the spider bite on his leg, made a note of Dr. Wu's order for the antibiotics Dicloxacillin and

28  ///

Bactroban ointment and further local wound care with Betadine, and faxed the order to the pharmacy. (U.F. 49.)

On January 30, 2003, Plaintiff was again seen by Dr. Wu regarding the spider bite and for abdominal pain. (U.F. 50.) Dr. Wu's clinical impression was an abscess with cellulitis and epigastric pain. (Id.) Dr. Wu wrote an order for the antibiotics Bactrim and Rifampin, and ordered a lipid tests (a check of cholesterol levels for health maintenance). (Id.) Defendant Ramirez took Plaintiff's vital signs prior to having him seen by Dr. Wu, and faxed Dr. Wu's order to the pharmacy. (U.F. 51.) Defendants contend that contrary to Plaintiff's allegations, Defendant Nguyen did not see Plaintiff on January 30, 2003, and did not tell Plaintiff that his leg did not need cleaned and wrapped and that Plaintiff could do it himself. (Nguyen Dec., ¶32.) Defendants contend that according to a review of Plaintiff's medical chart, Dr. Wu was the examining physician on that day. (Id.)

On February 7, 2003, Plaintiff had a lumbosacral spine X-ray taken, which revealed spondylosis (degenerative disease of the spine), but which was otherwise normal. (U.F. 52.)

On February 8, 2003, Defendant Snow treated Plaintiff in the ER for his continuing symptoms and for complaints of a spider bite and a sore leg. (U.F. 53.) After examining Plaintiff's leg, Dr. Snow's clinical impression was that Plaintiff had an old, healing staph abscess, but no current cellulitis (subcutaneous inflammation of connective tissue), or infection. (Id.) "Staph" is short for staphylococcus, a bacteria that infects the skin and mucus membranes. (Id.) Plaintiff had already been seen by other doctors for this leg condition. (Id.) Defendant Snow prescribed cortisone cream to be applied sparingly twice a day. (Id.)

On February 19, 2003, Plaintiff was seen by Dr. Wu for a complaint of abdominal pain since September 2001, as well as weight gain and a tinea infection in the groin area (fungal infection of the skin). (U.F. 54.) Dr. Wu's assessment was dyspepsia (upset stomach) and intestinal cramping. (U.F. 54.) Dr. Wu noted that both upper and lower GI series tests, as well as an ultrasound, had been done, prescribed Mycolog cream for the tinea, and Bentyl and Zantac for the abdominal pain, and ordered lipid tests for Plaintiff. (Id.) Defendant Ramirez made a note of Dr. Wu's order for Mycolog cream (for skin infections), and Bentyl and Zantac (for IBS and gas pain), and faxed the order to the pharmacy. (U.F. 55.)

On March 14, 2003, Plaintiff was seen by an outside specialist, Dr. Krishan at San Joaquin Community Hospital, for evaluation of abdominal pain. (U.F. 56.) Plaintiff also complained of back pain and constipation, but denied any bleeding from the rectum or nausea or vomiting. (Id.) After examining Plaintiff, Dr. Krishan's clinical impression was that the etiology of Plaintiff's abdominal pain was unclear and that it was necessary to rule out PUD and inflammatory bowel disease (IBD). (Id.) Dr. Krishan recommended that Plaintiff have a colonoscopy, and an EGD exam if the colonoscopy was negative. (Id.) IBS was also suspected. (Id.) Dr. Krishan recommended that Plaintiff be started on Metamucil and Vicodin. (Id.)

On March 15, 2003, Dr. Gonzales ordered Plaintiff be given Metamucil. (U.F. 57.) When an outside physician prescribes a medication, the order is first evaluated by an institutional physician to see if the medication is indicated and appropriate for the inmate. (U.F. 58.) The order then has to be rewritten by the institutional physician. (Id.) Once the medication order is rewritten, the prescription is filled by the pharmacy and sent out to the yard to be delivered to the inmate. (Id.)

On March 18, 2003, Dr. Wu reviewed Plaintiff's previous work-ups and the consultant's report from GI specialist Dr. Krishan. (U.F. 59.) Dr. Wu noted that the results of Plaintiff's barium enema in November 2002 were normal, that his upper GI series exam in August 2002 indicated Plaintiff had duodenitis, and that the August 2002 test for H. pylori bacteria (to investigate his dyspepsia and PUD symptoms) was negative. (Id.) Dr. Wu's note contains no order for any pain medication for Plaintiff. (Id.)

Defendant Ramirez contends that she has no recollection of Plaintiff coming to the clinic a couple of days after his March 14 appointment and inquiring about his medication and her telling him that they do not give out pain medication there, and there is no note referring to Plaintiff's request for pain medication on or near this date in his medical file. (Ramirez Dec., ¶12.) Defendant Ramirez denies that she would have made such a statement to an inmate, especially if medication had been prescribed by a staff physician, as one of the responsibilities of MTAs is to administer medications that are duly prescribed by the institutional physicians. (Id.) Defendant Ramirez could find no physician's order for medication for the date of March 18, 2003, in Plaintiff's medical file (the date on which Dr. Wu reviewed the consultant's report). (Id., ¶14.)

1    On March 31, 2003, Defendant Nguyen examined Plaintiff in the ER for complaints of chest

2    pain and pressure on the lower chest wall, abdominal pain, and shortness of breath. (U.F. 60.) The

3    physical exam was unremarkable and an EKG was normal, and Plaintiff had low coronary artery

4    disease risk. (Id.) Plaintiff had a history of hiatal hernia, which had been seen on a previous EGD

5    (esophageal gastroduodenoscopy) exam. (Id.) Plaintiff had a normal barium enema, and a normal

6    ultrasound of the abdomen. (Id.) Defendant Nguyen's diagnosis was likely hiatal hernia, and he

7    ordered Maalox and Protonix medications, which were given to Plaintiff in the ER. (Id.) The doctor

8    ordered more upon Plaintiff's return to the yard. (Id.)

9    Defendant Nguyen denies telling Plaintiff that they do not give out pain medication any more,

10   when Plaintiff allegedly asked about the Vicodin prescription recommended by Dr. Krishan.

11   (Nguyen Dec., ¶40.) Defendant Nguyen contends that he is unfamiliar with a medical test or

12   procedure called a "eudoscopy," which Plaintiff alleges he asked about. (Id.) Defendant Nguyen

13   contends that if Plaintiff is referring to an EGD (esophageal gastroduodenoscopy) exam, Plaintiff

14   received an upper GI series test on August 2, 2002, which is essentially similar to an EGD exam.

15   (Id.) Defendant Nguyen contends that he saw Plaintiff on March 31, 2003, in the ER as the ER

16   physician, and decisions to pursue tests such as an EGD, colonoscopy, or CT scan are made by the

17   inmate's primary physician, which was Dr. Wu at that time. (U.F. 61)

18   When outside specialists propose diagnostic tests, treatments, procedures, or medications for

19   inmate/patients, these recommendations are evaluated by an institutional physician and then ordered,

20   if felt to be medically indicated, necessary, and within CDC-approved criteria for patient care. (U.F.

21   62.) Based on Defendant Nguyen's review of Plaintiff's medical file, the decisions regarding the use

22   of Vicodin or other medications, and whether to pursue medical tests (including an EGD,

23   colonoscopy or CT scan), were made by Dr. Wu, who was Plaintiff's primary care physician in

24   March 2003. (Id.)

25   During the relevant time period (September 2001 through December 2003), Plaintiff was

26   seen by many medical doctors at SATF. (U.F. 63.) Defendants contend that these doctors, at various

27   times, ordered medications for Plaintiff according to the community standard of care, and appropriate

28   medications, including pain medications, were ordered for Plaintiff. (Nguyen Dec., ¶42.) Physicians

31

at SATF do order pain medications for inmates, including Vicodin, when and if it is clearly medically indicated. (U.F. 63.) Vicodin, as a narcotic, is not indicated for treatment of hiatal hernia and IBS. (Id.) These conditions tend to be chronic and the use of Vicodin would lead to abuse and addiction. (Id.) Vicodin was not medically appropriate or indicated on any of the occasions when Defendant Nguyen examined Plaintiff. (Id.) Additionally, when Plaintiff subsequently saw a GI specialist on November 5, 2003, the specialist, Dr. Bhaika, did not order Vicodin or any narcotic medication to treat Plaintiff's symptoms. (Id.)

On May 9, 2003, Plaintiff was seen by Dr. Wu for a complaint of abdominal pain, with pain before meals and more pain after meals. (U.F. 64.) Dr. Wu reviewed Plaintiff's previous work-ups, diagnosed IBS and indigestion, ordered the medications Protonix and Bentyl, and specified that Plaintiff was to be followed up in four weeks. (Id.)

On May 22, 2003, Plaintiff was sent from SATF to Corcoran District Hospital, where surgeon Dr. Schuster was to examine him and perform an EGD exam. (U.F. 65.) Dr. Schuster noted Plaintiff's chief complaint as epigastric abdominal pain since September 2001. (Id.) After taking the patient's history and doing a physical exam, Dr. Schuster's impression was that Plaintiff's abdominal pain was probably peptic in origin. (Id.) Dr. Schuster performed the EGD exam and found that Plaintiff had minimal gastritis (common, nonspecific irritation of the mucosa, or inner layer) of the stomach, but found no significant abnormalities in the esophagus, duodenum, or cords of the trachea. (Id.) Dr. Schuster noted that Plaintiff could resume a normal diet, walk as tolerated, and be returned to SATF. (Id.) No other recommendations for further follow up were noted by Dr. Schuster. (Id.)

Defendant Ramirez contends that she has no recollection of a conversation with Plaintiff on July 16, 2003, in which he asked about test results and was told by her that she would check and he should come back tomorrow, or of a conversation on July 17, 2003, in which Plaintiff again asked about his test results and was told by her that there was no record of his treatment in the file. (Ramirez Dec., ¶¶15-16.) Further, Defendant contends that there are no notes referring to these dates in Plaintiff's medical file. (Id.) Defendant contends that it is her pattern and practice to, upon inquiry, tell inmate/patients she will check to see if test results are available and then inform them

of the results of her search at a later date, and it is possible that her search yielded no test results on July 17, 2003. (Id.)

Defendant Ramirez contends that on August 13, 2003, Plaintiff was in the clinic and she was present when he complained to R.N. Avila of stomach pain. (Id., ¶17.) Defendant Ramirez contends that she wrote a progress note on August 13, 2003, about this event and it stated that Plaintiff confronted R.N. Avila with his complaint of stomach pain. (Id., ¶18.) Defendant Ramirez contends that R.N. Avila advised Plaintiff to stand by to see a physician and Plaintiff left but apparently returned within minutes demanding R.N. Avila's name. (Id.) Defendant Ramirez's progress note further documents that Plaintiff left upset while continuing to raise his voice, and was argumentative. (Id.)

With respect to Plaintiff's allegations that he went "man down," and went to the clinic stating he was in a lot of pain in his lower stomach, it was hard to breathe, he had a tingling sensation running through his body, and he had been throwing up; that he was told by R.N. Avila and Defendant Ramirez to lie down outside on the ground until they called for him; that he lay down on the handball court for forty-five minutes before coming to the door of the clinic; and that he was told, "No. Get away from here!" by Defendant Ramirez when he asked her if she was going to get him a doctor, Defendant Ramirez contends she has no recollection of making this statement to Plaintiff and would not have made such a statement to an inmate. (Id., ¶17.) Defendant Ramirez contends that it is not her pattern or practice to tell inmate/patients to lie down outside on the ground or to "get away from here," and that if an inmate/patient presented with symptoms of a serious nature, the pattern and practice would be to evaluate the patient and make note of it in the medical file. (Id., ¶¶17, 21.) Defendant contends that it would not be the practice to turn an inmate/patient away who demonstrates or complains of symptoms which might be indicative of a serious medical condition. (Id., ¶21.)

On August 14, 2003, Plaintiff complained to his counselor that he did not receive any of his medication. (U.F. 66.) Defendant Ramirez was able to get the original orders renewed and had Plaintiff scheduled for a follow-up appointment with his medical doctor on the yard on August 20, 2003. (Id.)

1      On August 20, 2003, Plaintiff went to the E yard clinic to obtain the results of his EGD

2    (endoscopic) exam, but the result was not available in the file. (U.F. 67.) Defendant Nguyen noted

3    that he would review the EGD results, and if the result was non-diagnostic, he would consider a CT

4    scan of the abdomen for Plaintiff. (Id.) Defendant Nguyen also discussed weight reduction with

5    Plaintiff, which may help reduce hiatal hernia symptoms, and talked to Plaintiff about his positive

6    Hepatitis C status, informing Plaintiff that because his viral count was below detectable levels,

7    treatment for Hepatitis C was not indicated. (Id.) Plaintiff was currently taking the medications

8    Protonix and Bentyl. (Id.) Defendant Nguyen denies telling Plaintiff not to eat all of his meals, and

9    getting mad at Plaintiff and asking him to leave the clinic. (Nguyen Dec., ¶46.)

10     Defendant Ramirez contends that on November 3 or 4, 2003, an incident occurred in which

11   Plaintiff was demanding to be seen and she had him escorted from the facility clinic window for

12   being loud and disruptive to the program. (Ramirez Dec., ¶¶23-24.) Further, Defendant recalls that

13   there was an emergency situation which required her attention, and once the situation resolved,

14   normal clinic operations would have resumed. (Id., ¶23.) Defendant contends that on or around

15   November 4, 2003, Ms. Fowlds, LVN, wrote a progress note documenting Plaintiff's bleeding

16   complaints, and noted that she was ordered by phone to send Plaintiff to the ER by Defendant

17   Nguyen. (Id.) That notation is followed by Defendant Snow's progress note documenting her

18   treatment of Plaintiff in the ER for small quantities of blood not explained by hemorrhoids and her

19   decision to sent him to an outside physician for a GI bleed work-up. (Id.)

20     Defendant contends that she does not recall telling Plaintiff to get away from her window or

21   that she did not care if he was bleeding, and Defendant denies she would make such a statement.

22   (Id.) Defendant contends that it is not her pattern or practice to turn an inmate/patient away who

23   demonstrates or complains of symptoms which might be indicative of a serious medical condition.

24   (Id.)

25     Plaintiff was in the ER on November 4, 2003, and treated by Defendant Snow. (U.F. 69.)

26   Plaintiff was seen and complained of bleeding from his rectum in teaspoon amounts. (Id.)

27   Defendant Snow took a history and did a physical exam of Plaintiff and reviewed the results of both

28   his prior upper and lower GI series exams. (Id.) Defendant Snow's diagnosis was lower

34

gastrointestinal bleeding. (Id.) Defendant Snow then sent Plaintiff by ambulance to Mercy Hospital in Bakersfield for further evaluation of a lower gastrointestinal bleed. (Id.)

On November 5, 2003, Plaintiff was evaluated by specialists Drs. Yokoyama and Bhaika of the GI clinic at Mercy Hospital. (U.F. 70.) Their impression was that Plaintiff had abdominal pain and a lower GI bleed. (Id.) Dr. Bhaika performed both esophageal gastroduodenoscopy ("EGD") and colonoscopy exams on Plaintiff. (Id.) Dr. Bhaika found that Plaintiff had no significant PUD, a spastic colon, polyps, mild non-specific proctitis, and internal hemorrhoids. (Id.) His recommendations were that Plaintiff be given a high fiber diet and should be prescribed Pepcid, Donnatal, Protonix, Anusol suppository, and Metamucil. (Id.) Dr. Bhaika noted that no further follow-up was needed, and his findings essentially concurred with the findings of the SATF physicians who had evaluated and treated Plaintiff. (Id.)

On November 6, 2003, institutional physician Dr. Deering reviewed GI specialist Dr. Bhaika's recommendations and ordered Protonix, Anusol, and Metamucil for Plaintiff. (U.F. 71.) On November 21, 2003, Defendant Nguyen saw Plaintiff in the E yard medical clinic for a complaint of pain on defecation. (U.F. 72.) Defendant Nguyen examined Plaintiff and reviewed Dr. Bhaika's November 5, 2003 report. (Id.) Defendant Nguyen did not have a separate diagnosis for Plaintiff and concurred with specialist Dr. Bhaika's finding that Plaintiff had IBS. (Id.) Also, when Dr. Bhaika examined Plaintiff on November 5, 2003, he made no recommendation for a CT scan. (Id.) Defendant Nguyen reordered a hemorrhoid suppository. (Id.)

Defendant Snow contends that she does not recall telling Plaintiff in November of 2003 or any other time that this is the way that he will probably be, that there is probably no cure for him, and that he will have to stay in pain for the rest of his life. (Snow Dec., ¶14.) Defendant Snow denies that she would have made such a statement regarding an episode of lower GI bleeding, but if it was in reference to Plaintiff's IBS, the condition is chronic, but ordinarily not life-threatening. (Id.)

IBS is a chronic condition affecting approximately 20% of the population and is caused by abnormal colon motility (or movement). (U.F. 73.) It is a chronic disorder which is characterized by periods of exacerbation and quiescence, and symptoms vary from patient to patient. (Id.) IBS

is not life-threatening or of an emergency nature, and it does not necessitate surgical treatment. (Id.) It is best treated conservatively, with a high fiber diet, adequate fluid intake, and regular exercise. (Id.)   When patients are more symptomatic, IBS can be additionally treated with fiber supplementation (such as Metamucil), and medications to reduce excessive colon contractions, such as Bentyl, all of which were prescribed for Plaintiff during the relevant time period. (Id.)

Defendants contend that at all times, their treatment of Plaintiff was within the community standard of care and was consistent with the degree of knowledge and skill ordinarily possessed and exercised by members of their profession under similar circumstances. (Nguyen Dec., ¶53; Snow Dec., ¶16; Smith Dec., ¶23; Ramirez Dec., ¶25.)  Defendants contend that at no point in time did they deny or intend to deny Plaintiff treatment that was medically necessary or warranted, and that given Plaintiff's complaints when he presented to them, based on their knowledge, skill, education, and observations of Plaintiff, and Plaintiff's medical records, the care rendered to him was proper and timely. (Nguyen Dec., ¶¶53-54; Snow Dec., ¶¶16-17; Smith Dec., ¶¶23-24; Ramirez Dec., ¶¶25-26.)  Defendants contend that there was never an intentional or deliberate delay on their part in ensuring Plaintiff was provided with or in providing him medical treatment, that they have not sought to cause Plaintiff injury or undue pain or suffering, and that they were, at all times, motivated by genuine concern for Plaintiff's health and well-being, as well as that of the other inmate/patients they serve. (Nguyen Dec., ¶54; Snow Dec., ¶17; Smith Dec., ¶25; Ramirez Dec., ¶27.)  Defendants Nguyen and Snow contend that in their medical opinions, Plaintiff was treated appropriately for all of his medical complaints. (Nguyen Dec., ¶55; Snow Dec., ¶18.)

The Court finds that Defendants have met their initial burden of informing the Court of the basis for their motion, and identifying those portions of the record which they believe demonstrate the absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986).  As stated above, in attempting to establish the existence of this factual dispute, Plaintiff may not rely upon the mere allegations or denials of his pleadings, but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  Rule 56(e);

36

1    Matsushita, 475 U.S. at 586 n.11; First Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747,

2    749 (9th Cir. 1973).

3           "Deliberate indifference is a high legal standard." Toguchi, 391 F.3d at 1060. "Under this

4    standard, the prison official must not only 'be aware of the facts from which the inference could be

5    drawn that a substantial risk of serious harm exists,' but that person 'must also draw the inference.'"

6    Id. at 1057 (quoting Farmer, 511 U.S. at 837). "'If a prison official should have been aware of the

7    risk, but was not, then the official has not violated the Eighth Amendment, no matter how severe the

8    risk.'" Id. (quoting Gibson v. County of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

9           "A difference of opinion between a prisoner-patient and prison medical authorities regarding

10   treatment does not give rise to a s 1983 claim," Franklin v. Oregon, 662 F.2d 1337, 1344 (9th Cir.

11   1981) (internal citation omitted), and a difference of opinion between medical personnel regarding

12   treatment does not amount to deliberate indifference. Sanchez v. Vild, 891 F.2d 240, 242 (9th Cir.

13   1989). To prevail, Plaintiff must set forth admissible evidence showing "that the course of treatment

14   the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose

15   this course in conscious disregard of an excessive risk to [his] health." Jackson v. McIntosh, 90 F.3d

16   330, 332 (9th Cir. 1986) (internal citations omitted). With respect to the delays allegedly caused by

17   Defendants turning him away on some occasions, Plaintiff must set forth admissible evidence

18   showing that the delays led to further harm. McGuckin, 974 F.2d at 1060 (internal citation omitted).

19                          a.    Defendant Snow

20          Plaintiff disputes that in October of 2001, when he went to the medical clinic for stomach

21   pain, shortness of breath, and a tingling sensation, Defendant Snow examined him and diagnosed

22   him. (Garcia Dec., ¶4; Comp., Facts, p.3.) Plaintiff contends that Defendant Snow did not examine

23   him and did not provide him with any treatment. (Id.) Plaintiff was subsequently seen for his

24   complaint of abdominal pain on November 27, 2001, by Dr. Katukota. (U.F. 15.)

25          Plaintiff next saw Defendant Snow on February 8, 2003, after he was bitten by a spider.

26   (U.F. 54; Garcia Dec., ¶5.) Plaintiff contends that Defendant Snow told him it was an old abscess

27   that he got from being homosexual. (Garcia Dec., ¶5; Comp., Facts, p.33.) Plaintiff left the

28   appointment with a tube of cortisone cream. (U.F. 53; Garcia Dec., ¶5; Comp., Facts, p.33.)

1    Plaintiff last saw Defendant Snow on November 4, 2003, for a complaint of bleeding from

2    his colon.  (U.F. 69; Garcia Dec., ¶7.)  Plaintiff contends that when he asked her about pain

3    medication and what could be done for him, she told him that he would be in serious pain for the rest

4    of his life.  (Garcia Dec., ¶7; Comp., Facts, p.48.)

5                    b.    Defendant Nguyen

6    On May 18, 2002, Plaintiff was transported to the ER for abdominal pain.  (U.F. 18; Garcia

7    Dec., ¶9; Comp., Facts, p.10.)  Plaintiff contends that Defendant Nguyen looked at the nurse's notes,

8    asked him some questions, prescribed Tylenol, and sent him back to the yard still in pain.  (U.F. 18;

9    Garcia Dec., ¶9; Comp., Facts, pp.10-11.)

10   On November 14, 2002, Defendant Nguyen diagnosed Plaintiff with IBS and a hiatal hernia.

11   (U.F. 36; Garcia Dec., ¶14.)  Plaintiff disputes the diagnosis and contends it was made without tests,

12   and contends he was provided medication for a condition he does not have.  (Garcia Dec., ¶10.)

13   Plaintiff contends that on January 30, 2003, Defendant Nguyen told him he could clean and

14   wrap his own leg, and cancelled the orders previously made by Dr. Wu.  (Garcia Dec., ¶11; Comp.,

15   Facts, p.10.)

16   On March 31, 2003, Plaintiff was seen by Defendant Nguyen, following his consultation with

17   an outside specialist on March 14, 2003.  (U.F. 60; Garcia Dec., ¶12.)  Plaintiff contends that

18   Defendant told him they do not give out pain medication anymore, and that he was left to suffer in

19   pain.  (Garcia Dec., ¶¶12-13.)

20   On August 20, 2003, Plaintiff was again seen by Defendant Nguyen.  (U.F. 67.)  Plaintiff

21   contends that Defendant Nguyen told him not to eat all of his meals and asked him to leave after

22   getting mad at him.  (Garcia Dec., ¶14.)  Plaintiff disputes that Defendant said he would consider

23   a CT scan and contends that Defendant Nguyen told Plaintiff he would set up a CT scan.  (Id.)

24   Finally, Plaintiff contends that when he went "man down" on November 4, 2003, with

25   bleeding from his colon, Defendant Nguyen was the doctor on duty and refused to come and see

26   Plaintiff during the time Plaintiff was in a holding cage.  (Garcia Dec., ¶16.)  Plaintiff contends that

27   Defendant Nguyen made the order to transport him to the CTC without examining him.  (Id.)

28   ///

1

       c. <u>Defendant Smith</u>

2     Plaintiff contends that on July 12, 2002, he went to the clinic with complaints of stomach

3 pain, shortness of breath, a tingling sensation, and difficulty eating solid food, and was told by

4 Defendant Smith that there was nothing she could do and to put in a medical request to see a doctor.

5 (Garcia Dec., ¶18; Comp., Facts, pp.15-16.)  Plaintiff contends that on July 30, 2002, he again went

6 to the clinic with complaints of stomach pain, shortness of breath, a tingling sensation, and a feeling

7 like he was having a heart attack.  (<u>Id</u>., ¶19 & pp.16-17.)  Plaintiff contends that Defendant Smith

8 told him there was nothing she could do for him.  (<u>Id</u>.)

9     Plaintiff contends that on September 9, 2002, when he stopped taking Donnatal and reported

10 to Defendant Smith that it was making him ill, Defendant told him to stop taking it until he saw a

11 doctor. (Garcia Dec., ¶20; Comp., Facts, pp.20-21.)  Plaintiff contends that Defendant knew he was

12 in pain and refused to treat him.  (<u>Id</u>., ¶20.)

13     Plaintiff contends that on November 13, 2002, he went to the clinic for a complaint of pain

14 and was told by Defendant Smith that she would get him in to see the doctor the next day.  (Garcia

15 Dec., ¶21; Comp., Facts, p.29.)  Plaintiff contends that he was left by Defendant Smith to suffer in

16 pain.  (<u>Id</u>.)

17     Finally,  Plaintiff contends that on December 15, 2002, he again went to the clinic with

18 complaints of stomach pain, difficulty breathing, and a tingling sensation. (Garcia Dec., ¶22; Comp.,

19 Facts, pp.29-30.)  Plaintiff contends that Defendant Smith told him she would get him in to see a

20 doctor the next day and denied him treatment for his pain.  (<u>Id</u>.)

21

       d. <u>Defendant Ramirez</u>

22     Plaintiff contends that on November 9, 2002, he went to the clinic for a complaint of pain

23 and was told by Defendant Ramirez that there was nothing she could do for him. (Garcia Dec., ¶23;

24 Comp., Facts, p.25.)  Plaintiff contends that on January 30, 2003, Defendant Ramirez stood by and

25 did nothing while a nurse denied him treatment (cleaning and wrapping the leg which had been bitten

26 by the spider).  (<u>Id</u>., ¶26.)  Plaintiff contends that on March 16, 2003, after his consult with the

27 outside specialist who recommended Vicodin, he asked Defendant Ramirez about the medication

28

and she told him they do not give it out.[7]  (Id., ¶27; Comp., p.36.)  Plaintiff contends that on July 16, 2003, he inquired about his test results and was told by Defendant Ramirez to come back the next day, and that on July 17, 2003, when he returned, he was told by Defendant Ramirez that she could not find them.  (Id., ¶¶28-29; Comp., p.41.)

Plaintiff contends that on August 13, 2003, after complaining of stomach pain, difficulty breathing, and a tingling sensation, he was told by Defendant Ramirez to lie down outside until he was called.  (Id., ¶30; Comp., p.42.)  Plaintiff contends that after forty-five minutes, he inquired about seeing a doctor and was told by Defendant that she was not going to call a doctor and to get away from there.  (Id.)

Finally, on November 4, 2003, Plaintiff contends that he went to the clinic because he was bleeding from his colon.  (Garcia Dec., ¶32; Comp., pp.46-47.)  Plaintiff contends that he was initially brought inside the clinic and then escorted back out after an alarm sounded.  (Id.)  Plaintiff contends that when he inquired about seeing a doctor, Defendant Ramirez had him removed and placed in a holding cage for approximately thirty minutes.  (Id.)  Plaintiff was subsequently transported to the CTC and then to an outside hospital.  (U.F. 69.)

The Court finds that Plaintiff has not set forth any admissible evidence that raises a triable issue of fact with respect to whether or not Defendants were deliberately indifferent to Plaintiff's serious medical needs.  With respect to Defendant Snow, assuming that Defendant turned Plaintiff away in October of 2001 without examining or diagnosing him, Plaintiff has submitted no evidence that the delay between that date and November 27, 2001, when he was seen by Dr. Katukota for abdominal pain, led to further harm.  Throughout the time period between October 2001 and November 2003, Plaintiff complained of abdominal pain, shortness of breath, and a tingling sensation.  Plaintiff was seen by doctors throughout this time period for these complaints.  Tests were run, diagnoses were made, and medications were prescribed.  Although Plaintiff disagrees with the treatment rendered and the diagnoses made, Plaintiff is not qualified to render an opinion that the treatment received was inadequate or incorrect, or that the diagnoses were incorrect.  Given

---

[7] Plaintiff's declaration states the year is 2002.  The undisputed facts, complaint, and opposition make clear that the year is 2003.  The error in the declaration appears to be typographical.

Plaintiff's subsequent history of complaints for the same symptoms, which were evaluated and treated by other physicians on various dates, Plaintiff's allegation that Defendant Snow turned him away in October of 2001 is simply insufficient to support a claim that on that day, Defendant Snow "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health . . . ," Farmer, 511 U.S. at 837, and that as a result, Plaintiff suffered further harm.

With respect to the spider bite, it is undisputed that Plaintiff received treatment on more than one occasion for the wound. The allegation that Defendant Snow told Plaintiff it was not a spider bite but a staph infection Plaintiff got from being homosexual does not support a claim of deliberate indifference. Plaintiff was seen by Defendant Snow on that date and given cortisone cream for his wound. That Defendant Snow may have made remarks in the course of treating Plaintiff that Plaintiff found offensive is immaterial. Offensive remarks do not rise to the level of an Eighth Amendment violation.

Finally, Defendant Snow's alleged remark made in November 2003 after the incident in which Plaintiff was treated for bleeding in his colon that Plaintiff would be in pain for the rest of his life does not support a claim of deliberate indifference. There is no evidence that in allegedly making this comment, Defendant "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health . . . ." Farmer, 511 U.S. at 837.

Turning to Defendant Nguyen, Plaintiff was treated by Defendant in the ER on May 18, 2002, for abdominal pain. Plaintiff's disagreement with the treatment rendered - the issuance of Tylenol - does not support a claim of deliberate indifference. Although Plaintiff may offer evidence that he was in pain and that the treatment rendered by Defendant Nguyen did not relieve his pain, Plaintiff is not qualified to opine that the diagnosis and treatment were medically inadequate or incorrect.

With respect to the diagnosis of IBS, made by Defendant Nguyen on November 14, 2002, this incident does not support a claim of deliberate indifference. Although Plaintiff disputes this diagnosis and contends that the medication he was prescribed was for a condition he does not have, Plaintiff is not qualified to render an opinion that he does not have IBS.

The alleged incident on January 30, 2003, in which Defendant Nguyen cancelled Dr. Wu's orders and told Plaintiff he could clean and wrap his own leg does not support a claim of deliberate

41

indifference. Plaintiff received treatment for the spider bite on his leg. There is no evidence in the record that Plaintiff suffered any further harm as a result of allegedly being told to clean and wrap his own leg or that the incident rose to the level of knowing disregard to a substantial risk to Plaintiff's health.

Likewise, Plaintiff's encounters with Defendant Nguyen on March 31, 2003, and August 20, 2003, do not support claims of deliberate indifference. Plaintiff was seen by Defendant on March 31, a diagnosis was rendered, and prescriptions were ordered. On August 20, Plaintiff was seen by Defendant, and his condition was discussed and a CT scan was considered. Plaintiff's allegations that he was left to suffer in pain are insufficient to give rise to a triable issue of fact because Plaintiff is not qualified to offer an opinion that the treatment rendered was inadequate or incorrect. Further, whether Defendant said he would order a CT scan or whether he said he would consider a CT scan is immaterial. Whether or not Defendant got angry at Plaintiff and asked him to leave and whether or not, in discussing Plaintiff's weight, Defendant told him to eat fewer meals is immaterial. Plaintiff has submitted no admissible evidence that on these dates, the treatment rendered was so inadequate or cursory that it amounted to deliberate indifference, or that Defendant's failure to provide Plaintiff with additional or different treatment on these dates caused Plaintiff further harm.

Finally, Defendant Nguyen's alleged failure to examine Plaintiff on November 4, 2003, before sending him to the CTC does not support a claim of deliberate indifference. After Plaintiff went to the clinic with a complaint of bleeding from his colon, Plaintiff was transported to the CTC on Defendant Nguyen's orders and then to an outside hospital on Defendant Snow's orders. Plaintiff's claim of deliberate indifference based on the care he received on this date is utterly frivolous. The record is devoid of any admissible evidence that a delay between the time he appeared at the clinic and the time he was transported to the CTC caused him any harm.

With respect to Defendants Smith and Ramirez, there is no admissible evidence that they "[knew] of and disregard[ed] an excessive risk to [Plaintiff's] health . . . ," Farmer, 511 U.S. at 837, or caused a delay in treatment that led to further harm to Plaintiff. The allegation that Defendant Smith told Plaintiff to stop taking Donnatal until he saw a doctor does not support a claim of deliberate indifference. The allegation that Defendant Ramirez told Plaintiff to return the next day

42

for his test results and then reported that she could not find them does not support a claim of deliberate indifference.  Regarding the spider bite, Plaintiff's allegation that Defendant Ramirez stood by while a nurse refused to clean and wrap his leg does not support a claim of deliberate indifference.  As previously set forth, Plaintiff received medical care for his spider bite and there is no evidence that any harm resulted due to the alleged failure to clean and wrap Plaintiff's leg. Finally, Defendant Ramirez's alleged statement that they do not give out pain medication when Plaintiff inquired about Vicodin does not support a claim for deliberate indifference.

The alleged incidents on July 12, 2002, July 30, 2002, November 9, 2002, November 13, 2002, December 15, 2002, and August 13, 2003, in which Plaintiff did not receive any treatment from Defendants Smith and Ramirez do not support claims of deliberate indifference.  Given Plaintiff's history of complaints for the same symptoms, which were evaluated and treated by physicians on various dates both prior to and subsequent to the dates Defendants Smith and Ramirez allegedly turned him away, Plaintiff's allegations that he did not receive any treatment on those particular dates do not support a claim that Defendants knowingly disregarded a substantial risk to Plaintiff's health.  Further, there is no evidence that Plaintiff suffered further harm due to not receiving treatment on those dates.

Lastly, as set forth above with respect to Defendant Nguyen, the allegations concerning the events on November 4, 2003, do not support a claim of deliberate indifference against Defendant Ramirez.  Plaintiff received medical care for his complaint of a bleeding colon on the day he made the complaint.   That Defendant Ramirez allegedly had him placed in a holding cage for approximately thirty minutes prior to his transfer to the CTC does not give rise to a claim of deliberate indifference.

In summary, although Plaintiff alleges that from September 2001 on, he suffered pain as a result of his medical condition and Defendants failed to take medically necessary or adequate actions to treat his condition and relieve his pain, Plaintiff's lay opinion is insufficient to give rise to a triable issue of fact concerning Defendants' treatment of his complaints. Defendants submitted evidence that Plaintiff was seen by various physicians throughout this time period, including several outside specialists, and received examinations, testing, diagnoses, and medications.  Although Plaintiff

disagrees with the diagnoses, believes he should have been provided with different and/or additional treatment, and believes he should have been provided with medications that relieved his pain, Plaintiff's disagreement with the diagnoses and treatment is insufficient to support a claim of deliberate indifference. Where, as here, Plaintiff was seen throughout the relevant time period for his complaints of pain and provided with treatment, the allegation that his pain remained unrelieved by the treatment is insufficient to give rise to a triable issue of fact. The record is devoid of any admissible evidence "that the course of treatment the doctors chose was medically unacceptable under the circumstances . . . and . . . that they chose this course in conscious disregard of an excessive risk to [P]laintiff's health." Jackson, 90 F.3d at 332. Accordingly, Defendants Snow, Nguyen, Smith and Ramirez are entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims against them.

C.   Defendant Bradish's Motion for Summary Adjudication

1.   Summary of Relevant Allegations Set Forth in Plaintiff's Complaint

In his complaint, Plaintiff alleges that during the month of December 2001, following his November 27, 2001, appointment with Dr. Katukota, he was not able to see anyone because the institution was on lockdown. Plaintiff alleges that he was giving his medical request forms to Defendant Bradish during this time. Plaintiff alleges that in January of 2002, he was filling out request forms to see a doctor and giving them to Defendant Bradish and MTA Rasco, but the institution was still on lockdown, so he was unable to get help for his pain.

Plaintiff alleges that on April 1, 2002, he went to the clinic and told Defendant Bradish that he was very ill and in a lot of pain. Plaintiff alleges that Defendant refused him treatment. Plaintiff alleges that on April 17, 2002, he went to the clinic and told Defendant Bradish that he was very sick and needed help, and asked if she knew where the inmate appeal he had given MTA Rasco on March 29, 2002, was. Plaintiff alleges Defendant Bradish told him Rasco was home sick and he would have to wait until Rasco returned. Plaintiff alleges that he told her he was "man down" and needed to see a doctor. Plaintiff alleges Defendant Bradish refused to let him see a doctor.

Plaintiff alleges that on April 30, 2002, he told Defendant Bradish he was very ill, but he was denied medical attention and turned away. Plaintiff alleges that on May 17, 2002, he told Defendant

44

Bradish he had been throwing up since eating breakfast and was in pain.  Plaintiff alleges Defendant checked his blood pressure, told him he was alright, and sent him away.

2.    Statement of Undisputed Facts

1.    Plaintiff is and was at all relevant times incarcerated at SATF.

2.    Defendant Bradish was employed by the CDC as a Registered Nurse at SATF during the relevant time period.

3.    Plaintiff's complaint alleges that during December of 2001 and January of 2002, while D-yard was in lockdown, he submitted to Defendant Bradish written medical request forms to be seen by a doctor.

4.    As an R.N. at SATF, Defendant Bradish was assigned to various roles.

5.    One role was to provide inmates' doctor-prescribed medication during "pill call," or "med. pass."

6.    Inmates are allowed to keep "cold medications" in their cell, such as blood pressure medications, aspirin, Tylenol, Motrin, and diabetic pills.

7.    "Hot medications," such as narcotics and psychiatric medications, were given to the inmate during pill call.

8.    The pharmacy would send the inmate's medication to the medical facility in baggies which were labeled with inmate's name, housing and CDC number.

9.    Either an R.N. or the LVN on staff would put the inmate's medication in small coin size envelopes.

10.    Then the R.N. would deliver the medication to the inmate's cell.

11.    During pill call, an inmate can request a medical request form, also commonly referred to as a "sick call slip," or "request for doctor's line."

12.    An inmate submits a medical request form so he can be seen by a doctor regarding a medical complaint.

13.    For this reason, Defendant Bradish routinely kept medical request forms with her during pill call.

///

14. Once she gave the inmate the medical request form, the inmate had the option of filling out the form at that time and directly giving it back to her, filling the form out later and turning it into the medical facility, or giving it to another medical personnel or inmate to turn in for him.

15. During December of 2001 and January of 2002, Defendant Bradish gave to Plaintiff and received from him medical request forms during pill call.

16. Plaintiff's complaint also alleges that on April 1, 17, 30, and May 17 of 2002, he came to the medical clinic window at the D-yard, stating that he was having pain in his stomach, and that Defendant Bradish did not allow him to see a doctor.

17. Another role as an R.N. at SATF is to assist with inmate medical complaints at the medical facility window on the D-yard.

18. When the prison is not in lockdown status, an inmate can go to the medical window and wait in line to speak to medical personnel in order to seek medical treatment.

19. At the medical window, the R.N. obtains information from the inmate regarding his medical complaint.

20. If the inmate was not in need of urgent medical treatment, Defendant would assess whether or not the inmate needed to be seen by the doctor.

21. If a doctor was not available that day or his/her schedule was full, the inmate could come back the next day.

       3.   <u>Discussion</u>

    As an R.N. at SATF, Defendant Bradish ("Defendant") was assigned to various roles. (U.F. 4.) One role was to provide inmates' doctor-prescribed medication during "pill call," or "med. pass." (U.F. 5.)  Inmates are allowed to keep "cold medications" in their cell, such as blood pressure medications, aspirin, Tylenol, Motrin, and diabetic pills. (U.F. 6.)  "Hot medications," such as narcotics and psychiatric medications, were given to the inmate during pill call. (U.F. 7.)  The pharmacy would send the inmate's medication to the medical facility in baggies which were labeled with inmate's name, housing and CDC number. (U.F. 8.)  Either an R.N. or the LVN on staff would

///

46

1    put the inmate's medication in small coin size envelopes. (U.F. 9.)  Then the R.N. would deliver the

2    medication to the inmate's cell. (U.F. 10.)

3    During pill call, an inmate can request a medical request form, also commonly referred to as

4    a "sick call slip," or "request for doctor's line." (U.F. 11.)  An inmate submits a medical request

5    form so he can be seen by a doctor regarding a medical complaint. (U.F. 12.)  For this reason,

6    Defendant Bradish routinely kept medical request forms with her during pill call. (U.F. 13.)  Once

7    she gave the inmate the medical request form, the inmate had the option of filling out the form at that

8    time and directly giving it back to her, filling the form out later and turning it into the medical

9    facility, or giving it to another medical personnel or inmate to turn in for him. (U.F. 14.)

10   Defendant Bradish contends that if the medical request form was given back to her, she

11   would take it back to the medical facility and review it, and she would make sure that the doctor was

12   provided with the inmate's medical request form. (Bradish Dec., ¶7.)  Defendant contends that it

13   was solely the doctor's decision whether or not to see the inmate. (Id.)

14   During December of 2001 and January of 2002, Defendant Bradish gave to Plaintiff, and

15   received from him, medical request forms during pill call. (U.F. 15.)  Defendant contends that she

16   followed the normal procedure for reviewing the forms and providing the information to the doctor,

17   and that she had no control over the doctor's decision regarding whether the inmate should be seen.

18   (Bradish Dec., ¶8.)

19   Another role as an R.N. at SATF is to assist with inmate medical complaints at the medical

20   facility window on the D-yard. (U.F. 17.)  When the prison is not in lockdown status, an inmate can

21   go to the medical window and wait in line to speak to medical personnel in order to seek medical

22   treatment. (U.F. 18.)  At the medical window, the R.N. obtains information from the inmate

23   regarding his medical complaint. (U.F. 19.)

24   Defendant Bradish contends that if the inmate was in need of urgent medical treatment, such

25   as he provided a history of trauma and demonstrated signs consistent with a fracture, was bleeding,

26   passed out, etc., she would send or take him to the infirmary for immediate medical treatment.

27   (Bradish Dec., ¶10.)  If the inmate was not in need of urgent medical treatment, she would assess

28   whether or not the inmate needed to be seen by the doctor. (U.F. 20.)  Defendant contends that if

she determined that the inmate needed to be seen by the doctor, she would put the inmate's name down on the doctor's list of patients to see. (Bradish Dec., ¶10.) If a doctor was not available that day or his/her schedule was full, the inmate could come back the next day. (U.F. 21.)

Plaintiff alleges that on April 1, 17, 30, and May 17 of 2002, he came to the medical clinic window at the D-yard and stated that he was having pain in his stomach, and Defendant would not allow him to see a doctor. (U.F. 16.) Defendant Bradish contends that during the time that Plaintiff came to the medical window with a medical complaint, he did not make complaints nor exhibit signs that indicated to Defendant that he required urgent medical care. (Bradish Dec., ¶11.) Defendant contends that she then assessed whether or not Plaintiff needed to be seen by a doctor, and if she felt Plaintiff needed to be seen by a doctor, she would have put his name down on the doctor's list of patients to see. (Id.) Defendant contends that if the doctor's schedule was full, Plaintiff could have come back the next day, and after Plaintiff came to the medical window on April 1, 17, and 30, 2002, he did not come back those following days. (Id.) Defendant contends that aside from filling out medical request forms and going to the medical facility window, the various ways an inmate can obtain medical treatment include telling a Custody Officer he needs medical treatment, telling a Medical Technical Assistant he needs medical treatment, or filing out an 602 inmate grievance appeal form. (Id., ¶12.)

Defendant contends that her decisions made in this case were based solely on her professional judgment as an R.N., her personal observations of the Plaintiff, the history he provided her, and the policies and procedures of the institution. (Id., ¶13.) Defendant contends that at no time did she believe that Plaintiff was suffering from a condition or illness which required immediate urgent medical care, and that with each contact, she exercised that degree of care and skill ordinarily possessed and exercised by reasonably prudent registered nurses under similar circumstances. (Id., ¶¶14-15.) Defendant denies ever deliberately denying, delaying, or interfering with any medical care to Plaintiff. (Id., ¶16.) Defendant argues that Plaintiff's disagreement with her assessment that he did not need medical care does not constitute deliberate indifference, as it is merely a disagreement in treatment, and that Plaintiff has not shown that any delay in treatment led to further injury.

///

48

1    The Court finds that Defendant has met her initial burden of informing the Court of the basis

2    for her motion, and identifying those portions of the record which she believes demonstrate the

3    absence of a genuine issue of material fact.  The burden therefore shifts to Plaintiff to establish that

4    a genuine issue as to any material fact actually does exist.  In order to meet his burden, Plaintiff must

5    set forth admissible evidence that supports a claim that in not ensuring that Plaintiff was seen

6    immediately by a doctor, Defendant Bradish "[knew] of and disregard[ed] an excessive risk to

7    [Plaintiff's] health . . . ," Farmer, 511 U.S. at 837, and that the delay in treatment caused further

8    harm to Plaintiff.  McGuckin, 974 F.2d at 1060 (citation omitted).  Defendant Bradish "must not

9    only 'be aware of the facts from which the inference could be drawn that a substantial risk of serious

10   harm exists,' but . . . 'must also draw the inference.'" Toguchi, 391 F.3d at 1057 (quoting Farmer,

11   511 U.S. at 837).  If Defendant "'should have been aware of the risk, but was not, then . . . [she] has

12   not violated the Eighth Amendment, no matter how severe the risk.'" Id. (quoting Gibson v. County

13   of Washoe, Nevada, 290 F.3d 1175, 1188 (9th Cir. 2002)).

14   The Court finds that Plaintiff has not set forth any evidence that raises a triable issue of fact

15   with respect to whether or not Defendant Bradish acted with deliberate indifference to his medical

16   needs in December of 2001, and January, April, and May of 2002, or whether the alleged delay

17   caused by her failure to render treatment to him on those dates caused him further harm.  The record

18   in this action, as set forth in this Findings and Recommendations, establishes that Plaintiff's medical

19   complaints during the time period relevant to his claims against Defendant Bradish were the

20   complaints he had from September 2001 through the time the complaint was filed in November of

21   2003.  (Undisputed Facts, Section B; Plaintiff's Comp.)  During this time period of over two years,

22   Plaintiff was seen by physicians both inside and outside the prison for his complaints of severe pain.

23   (Id.)  Various tests were run, diagnoses were rendered, and medications were prescribed.  (Id.)  As

24   previously set forth, although Plaintiff is competent to offer his testimony that he was in pain and

25   that none of the Defendants took any action which resulted in the relief of his pain, Plaintiff is not

26   competent to render an opinion that he suffered pain throughout this time period because Defendants

27   and other physicians mis-diagnosed him and/or chose courses of treatment which were medically

28   unacceptable.  As such, there is no evidence before the Court that in December of 2001 and January

of 2002, by failing to ensure that Plaintiff was seen by a doctor at the time of his complaints to her, Defendant Bradish acted with deliberate indifference, and there is no evidence before the Court that on April 1, 17, and 30, and May 17 of 2002, Defendant Bradish, by failing to have Plaintiff seen by a doctor on those dates, acted with deliberate indifference. Plaintiff's disagreement with Defendant's assessment of his condition and the urgency of his need to see a physician does not support a claim of deliberate indifference. Further, there is no evidence that the delays in being seen by a doctor caused Plaintiff any further harm. Accordingly, Defendant Bradish is entitled to judgment as a matter of law on Plaintiff's Eighth Amendment claims against her.

D.     Plaintiff's Motion for Preliminary Injunctive Relief

On August 2, 2005, Plaintiff filed a motion seeking a preliminary injunction mandating his transfer to a different institution where he will be able to obtain treatment which relieves his pain. The purpose of a preliminary injunction is to preserve the status quo if the balance of equities so heavily favors the moving party that justice requires the Court to intervene to secure the positions until the merits of the action are ultimately determined. University of Texas v. Camenisch, 451 U.S. 390, 395 (1981). A preliminary injunction is available to a plaintiff who "demonstrates either (1) a combination of probable success and the possibility of irreparable harm, or (2) that serious questions are raised and the balance of hardship tips in its favor." Arcamuzi v. Continental Air Lines, Inc., 819 F. 2d 935, 937 (9th Cir. 1987). Under either approach the Plaintiff "must demonstrate a significant threat of irreparable injury." Id. Also, an injunction should not issue if the Plaintiff "shows no chance of success on the merits." Id. At a bare minimum, the Plaintiff "must demonstrate a fair chance of success of the merits, or questions serious enough to require litigation." Id.

In this instance, as set forth in the preceding sections, the Court finds that Defendants are entitled to judgment as a matter of law on Plaintiff's claims against them. For this reason, Plaintiff cannot demonstrate a fair chance of success on the merits and is not entitled to preliminary injunctive relief. The Court shall therefore recommend that Plaintiff's motion be denied.

///

///

50

E.     Conclusion

Based on the foregoing, it is HEREBY RECOMMENDED that:

1.     Defendants Snow, Nguyen, Smith, and Ramirez's motion for adjudication on Plaintiff's Eighth Amendment claims against them, filed August 12, 2005, be GRANTED;

2.     Defendant Bradish's motion for summary adjudication on Plaintiff's Eighth Amendment claims against her, filed November 14, 2005, be GRANTED; and

3.     Plaintiff's motion for preliminary injunctive relief, filed August 5, 2005, be DENIED.

These Findings and Recommendations will be submitted to the United States District Judge assigned to the case, pursuant to the provisions of Title 28 U.S.C. § 636(b)(l).  Within **thirty (30) days** after being served with these Findings and Recommendations, the parties may file written objections with the Court.  The document should be captioned "Objections to Magistrate Judge's Findings and Recommendations."  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:     February 7, 2006**                              **/s/ Sandra M. Snyder**
icido3                                                UNITED STATES MAGISTRATE JUDGE

51